**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

May 19 2014, 9:09 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**LISA M. DILLMAN**
Dillman & Associates, LLC
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN RE THE MARRIAGE OF: | ) |
| | ) |
| WILLIAM ADAMSON, | ) |
| | ) |
| Appellant, | ) |
| | ) |
| vs. | ) No. 55A05-1310-DR-485 |
| | ) |
| PAMELA ADAMSON, | ) |
| | ) |
| Appellee. | ) |

APPEAL FROM THE MORGAN CIRCUIT COURT
The Honorable Matthew G. Hanson, Judge
Cause No. 55C01-0804-DR-341

**May 19, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BAILEY, Judge**

## Case Summary

W.A. ("Father") appeals an order of the Morgan County Circuit Court denying his motion to modify the physical custody of K.A. ("Child"), the child of his marriage to P.A. ("Mother"), granting sole legal custody to Mother, finding Father in contempt of court, and requiring his payment of Mother's attorney's fees. We reverse and remand for further proceedings.

## Issue

Father presents three issues for review, which we consolidate and restate as a single issue: whether the findings of fact, conclusions of law, and order are clearly erroneous in that they are contrary to statutory authority and lack evidentiary support.

## Facts and Procedural History

The parties were married on July 18, 2004 and divorced on February 9, 2009. They agreed to share joint legal custody of their only child, who had been born in 2005, with Mother having physical custody. Father was to exercise parenting time on alternate weekends, and two weeknights of each week from 6:00 p.m. until 8:30 p.m. By agreement of the parties, Child actually spent significantly more time with Father than contemplated by the parenting time order.[1]

In 2011, Father petitioned to modify the physical custody of Child. Hearings were conducted on December 15, 2011 and on June 26, 2012, with Child continued in "her present

---

[1] In court hearings conducted in late 2011 and mid-2012, Father contended that Child started living with him in October of 2009. Mother contended that the accurate date was one year later.

placement" with Father until further order of court. (App. 7.) On June 29, 2012, the request to modify custody was denied.

On February 26, 2013, Indianapolis Metropolitan Police Department Officer Lauren Popovich ("Officer Popovich") was dispatched to Father's home to conduct a "child abuse investigation." (Tr. 8.) Officer Popovich interviewed Child, who reported that Mother's live-in boyfriend B.E. ("Boyfriend") had struck her with a stick.[2] The officer observed a small bruise around Child's tailbone. Child also reported that certain things had happened when Mother would leave to do laundry; specifically, that Boyfriend had tied her wrists and ankles together, had given her snacks while denying her dinner, and had locked her in her room but rushed to release her when Mother came home. Officer Popovich asked Child if she was "scared to be at her daddy's" and if she was "scared to be at mommy's." (Tr. 13.) Child denied being frightened at Father's house and admitted being frightened at Mother's house.

Officer Popovich and her partner contacted a child abuse detective, who reportedly "didn't feel like it was enough for us at the time to go make an arrest[.]" (Tr. 14.) Officer Popovich then advised Father: "as a police officer, I could not tell him to disobey a court order but if it was my child and from what she would have told me, I would not have sent her home." (Tr. 14.)

---

[2] Officer Popovich described the report of the incident: "there was like a plastic stick that would be like attached to like a small, like Mylar balloon and she was playing with it and she said she was trying to turn her little sister into a frog. Like she was pretending she was a princess. And [Boyfriend] had take[n] the stick from her and had hit her across the butt from [sic] it." (Tr. 11.)

3

The next day, Father filed an emergency motion for custody modification. He also decided not to return Child to Mother or to her first grade classroom. Instead, he picked up work for completion at home. Mother filed a motion seeking an emergency hearing, a modification of legal custody, and a finding of contempt against Father. The trial court issued a protective order prohibiting Boyfriend from having contact with Child and permitted Mother to resume exercising her physical custody of Child. Mother, Child, and a younger sibling moved in with Mother's mother.[3]

Father sought counseling services for Child. She reported to her therapist that she had been "treated meanly." (Tr. 334.) Mother was permitted to join in some of the counseling sessions.

On March 18, 2013, the trial court conducted the first of three evidentiary hearings. Officer Popovich testified as to her observations and interview with Child. In addition to relating events that had allegedly happened while Mother was out of the house, Officer Popovich testified that Child had reported an incident at WalMart that had "happened the same week." (Tr. 16.) Reportedly, Boyfriend had pulled back Child's fingers and twisted her arm.

Child's teacher testified that Child had, just before her extended absence from school, complained of back pain. She stated that Child had missed three weeks of school, but had completed her assignments at home and her tests on-line. Child was described as a "star student." (Tr. 23.)

---

[3] Mother was pregnant with her third child.

4

Child, then aged seven, testified over Mother's objection as to competency. Child related that Boyfriend had pulled her fingers back and twisted her arm and "stuff like that." (Tr. 46.) She demonstrated a twisting motion. According to Child, she had told Mother once that Boyfriend had hurt her. Child described having been locked in her room, Boyfriend running to release her when Mother returned, Boyfriend striking her with a balloon stick, Boyfriend putting a rope around her neck, and Boyfriend calling her names such as "meathead." (Tr. 54.) She testified that she was afraid and wanted to live with "Daddy, I guess." (Tr. 55.)

A second hearing took place on July 18, 2013. Father testified that "somewhere in between the start of school and October," Child had begun to complain about Boyfriend's treatment of her. (Tr. 75.) According to Father, Child had reported Boyfriend locking her in her room, pinching her on the arms, choking her, restricting her food, striking her with a balloon stick, and hitting her with a wooden drumstick from a musical video game. Also according to Father, Child had reported that Mother had tried at times to stop Boyfriend. Father acknowledged that, despite some payments, he was in arrears on his child support. He claimed an inability to pay $75.00 weekly.

Family case manager Allison Gray ("Gray") testified concerning the investigation of abuse allegations conducted by the Marion County Department of Child Services ("DCS"). Gray had observed only very faint discoloration on Child's back. After initial nervousness, Child had, in Gray's opinion, developed a rapport with her. Child had reported Boyfriend spanking her with a plastic stick, putting a string or rope around her neck, bending back her

5

fingers when they were in a store, and grabbing her "by the head" in an attempt to lift her off the ground. (Tr. 171.) Child had reported feeling safe at Father's home but not at Mother's home. When Gray had interviewed Mother, Mother expressed concern that Child had been coached.

The DCS report indicated that allegations of physical abuse were unsubstantiated. Gray opined that there was "no further need for DCS intervention when the protective order was put in place." (Tr. 175.) In Gray's view, in addition to the faintness of the mark on Child's body, the protective order was a factor in the listing of "un-substantiation" and it played "a big role." (Tr. 188.)

Child again testified, relating that she "used to live with Daddy a lot" but was happy to return to Mother during the prior summer. (Tr. 196.) She further testified that, after Christmas, Boyfriend had begun to hurt her. She described being hit "really hard" with drumsticks. (Tr. 198.) Child expressed her belief that Mother didn't know about her being locked in her room and explained that, if Child told, she expected to be in trouble with Boyfriend "cause he's just always mean to me."[4] (Tr. 200.) She testified that Mother and her Nana had told her not to lie, and she couldn't talk to Mother "about court" because "sometimes she thinks I'm lying." (Tr. 210.) However, Child opined that she would be happy if she could live with her siblings and Mother, without Boyfriend.

---

[4] More specifically, Child testified: "He didn't tell me something would happen, but I just thought." (Tr. 208.)

Boyfriend testified and denied any physical abuse of Child. He acknowledged that there had been a plastic balloon stick and video game drum sticks in the couple's home, but denied that he had ever used them to hit Child.

At the third and final hearing, conducted on August 26, 2013, Mother testified. She denied observing signs of abuse of Child, and asserted that Child had lied. She explained that locks were removed from her children's bedroom doors for their protection. She admitted having authored a social media post, with a photo of herself and Boyfriend kissing, containing a reference to "living with that psycho." (Pet. Ex. 9.)[5] Child's maternal grandmother testified and denied seeing markings on Child.

At the conclusion of the hearing, Father attempted to call Child to authenticate a handwritten note in which she purportedly accused Mother of recently telling her "I f—n hate you." (Pet. Ex. 12.) The trial court expressed reservations about Child testifying again but stated that she would be called if Mother did not agree to admission of the document without testimony. The letter was admitted by agreement.

On September 4, 2013, the trial court entered its findings of fact, conclusions of law, and order. Father's petition for modification of physical custody was denied. Mother was awarded sole legal custody of Child, and the protective order was dismissed. Father was found to be in contempt of court and ordered to serve 30 days in jail, suspended upon condition that he pay $10.00 weekly on his child support arrearage. He was ordered to pay

---

[5] The Facebook post stated: "I wish life had a rewind button so that I could go back to this time and how things were - maybe not living with that psycho - but knowing the feelings he had for me and being able to feel and know how much he loved me." (Pet. Ex. 9.) Mother testified that the reference to psycho in the middle of the post referred to a former female roommate; the remainder referred to Boyfriend.

7

$4,000.00 of Mother's attorney's fees. Additionally, the trial court ordered that there could be no agreement by the parents to deviate from the parenting time schedule.

Father appeals.

**Discussion and Decision**

I. Standard of Review

At the outset, we note that Mother has failed to file an appellee's brief. When the appellee fails to submit a brief, we need not undertake the appellee's burden of responding to arguments that are advanced for reversal by the appellant. Hamiter v. Torrence, 717 N.E.2d 1249, 1252 (Ind. Ct. App. 1999). Rather, we may reverse the trial court if the appellant makes a prima facie case of error. Id. "Prima facie" is defined as "at first sight, on first appearance, or on the face of it." Id. Still, we are obligated to correctly apply the law to the facts in the record in order to determine whether reversal is required. Mikel v. Johnston, 907 N.E.2d 547, 550 n.3 (Ind. Ct. App. 2009).

The trial court entered findings of fact and conclusions of law pursuant to Indiana Trial Rule 52(A). Such findings must disclose a valid basis for the legal result reached in the judgment, and the evidence presented must support each of the specific findings. J.M. v. N.M., 844 N.E.2d 590, 599 (Ind. Ct. App. 2006), trans. denied.

Upon review, we apply the following two-tiered standard: whether the evidence supports the findings and whether the findings support the judgment. Redd v. Redd, 901 N.E.2d 545, 549 (Ind. Ct. App. 2009). The trial court's findings and conclusions will be set aside only if they are clearly erroneous, that is, if the record contains no facts or inferences

8

supporting them. Id. A judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made. Id. We do not reweigh the evidence, nor will we assess the credibility of witnesses, but consider only the evidence most favorable to the judgment. Id. We review conclusions of law de novo. Id. Finally, we generally give considerable deference to the trial court's findings in family law matters as the trial court is in the best position to become acquainted with the relationship between parents and their children. Id.

## II. Analysis

### A. Custody Order

The trial court concluded that there was not a substantial change in a statutory factor relevant to custody modification, physical custody of Child should be continued in Mother, and joint legal custody should be modified to Mother having full legal custody. Father contends that the conclusions of the trial court regarding physical and legal custody of Child are internally inconsistent and unsupported by factual findings based upon evidence of record. We agree.

Indiana Code Section 31-17-2-8 sets forth factors to be considered by the trial court when making a custody determination, providing in relevant part:

> The court shall determine custody and enter a custody order in accordance with the best interests of the child. In determining the best interests of the child, there is no presumption favoring either parent. The court shall consider all relevant factors, including the following:
>
> (1) The age and sex of the child.
> (2) The wishes of the child's parent or parents.

9

(3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.
(4) The interaction and interrelationship of the child with:
(A) the child's parent or parents;
(B) the child's sibling; and
(C) any other person who may significantly affect the child's best interests.
(5) The child's adjustment to the child's:
(A) home;
(B) school; and
(C) community.
(6) The mental and physical health of all individuals involved.
(7) Evidence of a pattern of domestic or family violence by either parent.
(8) Evidence that the child has been cared for by a de facto custodian[.]

A panel of this Court explained the noncustodial parent's burden of proof in a custody modification proceeding in Simons v. Simons, 566 N.E.2d 551, 554-55 (Ind. Ct. App. 1991), as follows:

> In an action to modify a custody order, the noncustodial parent seeking custody has the burden of establishing that the original or existing custody order should be modified due to a substantial and continuing change in circumstances. In a modification hearing, the trial judge must consider the evidence with the best interests of the child or children uppermost in his or her mind as the paramount concern. With regard to a decision to modify a child custody order, the trial court must determine that the changed circumstances warranting modification must be of a decisive nature and such changed circumstances will support a modification order only if such order is necessary for the welfare of the child or children involved, thereby conclusively establishing that the existing custody order is unreasonable.

Here, the trial court ultimately concluded: "From the evidence presented in this case the court cannot find there is a substantial change in any of the [statutory] factors" and even assuming a substantial change, "the current living situation has not become unreasonable." (App. 19.) At the same time, however, the court found that legal custody should be changed. In reaching the facially inconsistent conclusions, the trial court stopped short of overtly

10

discarding the entirety of Child's testimony. Among the trial court's findings or observations are the following:

> The police and CPS found consistent issues with the child but there were not clear times or dates of any incidents and there were not sufficient details of every negative interaction reported by the child.

> While the child is very smart for her age, her testimony was not very helpful, seemed coached at times, was weak on major points of her alleged contentions and was clearly affecting the child. …

> Her first two times testifying were about incidents she alleged, but she only had the larger details and lacked other indicia of reliability such as time, place, location and other things that would support her contentions. …

> The child, while testifying about some incidents of "abuse," did not give concrete evidence of any real incident or incidents that occurred for which this court can support a finding that abuse occurred. …

> That again while this court shared its concerns above with any abuse allegation, there is no real evidence any abuse occurred here.

(App. 15, 18-21.)

During the first hearing, Child testified that Boyfriend "pulls my finger back and twists my arm and stuff like that." Tr. 46. She demonstrated twisting and testified that it hurt her. She also testified that Boyfriend tightened a rope around her neck, and that this also hurt her. She described being spanked with a balloon stick:

> I bought a balloon from Wal-Mart and the stick comes off. I was pretending I was turning [sibling] into a frog with it and pretending it was a wand and uh, I dropped it. [Boyfriend] grabbed it before I could and spanked me."

(Tr. 50.) Child also said that she was locked in her room by Boyfriend when Mother was doing laundry and then "[Boyfriend] runs to the door and unlocks it and told me to run in

there and sit on the couch and pretend nothing happened." (Tr. 53.) She "didn't know why."
(Tr. 57.)

During the second hearing, Child related an incident that she believed took place before her December birthday:

Question: What did [Boyfriend] do with the drumsticks?

Child: I was cold so I was like doing this with my knees and the drumsticks, he got them and then he hit my knees with them really hard.

Question: Did it hurt?

Child: Uh-hum.

Question: Did he do that to you more than once?

Child: He said the next time I did it, he would do it, so I didn't do it anymore.

Question: Did he tell you why he did that?

Child: No.

Question: So you don't know why he hit you?

Child: No.

(Tr. 198.) She described being put in her room with fruit or a granola bar instead of dinner; she "didn't think" that Mother knew. (Tr. 200.) She related her expectation that, if she told her mother, she would get in trouble because Boyfriend was "just always mean to me." (Tr. 200.) She specified that Boyfriend had twisted her arm at Wal-Mart.

Boyfriend, while denying physical violence against Child, acknowledged that the items described by Child – a Mylar balloon stick and video game drumsticks – had been present in his home. Officer Popovich testified that she had observing bruising on Child and

12

related that Child had given a "very accurate" description of her treatment. (Tr. 12.) Child's teacher testified that she had complained of back pain in this same time frame.

In sum, while the trial court insisted upon detailed, "concrete" and "real" evidence of physical abuse, there is no lack of such evidence in the record. (App. 21.) Child consistently reported to investigating police officers and child welfare caseworkers that she had been abused by Boyfriend; she consistently testified to the same in open court. Her reports were partially corroborated by the investigating officer's observation and her teacher's testimony.

Mother, according to her own testimony, believed that Child was lying. However, while noting Mother's concerns of coaching, and stating that Child's testimony "seemed coached at times," the trial court did not enter a factual finding that Child's testimony was unworthy of belief because of coaching; nor did the court find that Child's testimony was wholly lacking in credibility. Rather, the trial court minimized Child's testimony and appeared to defer to the DCS closure of the case with a designation that physical abuse had been unsubstantiated:

> [I]n this case, CPS and the police both investigated and did not find grave enough concerns that charges should have been filed.

> This Court is well aware of CPS and their role in investigations and from thirteen (13) years of experience, they will always err on the side of allegations that have any credible proof and file cases.

> The child, while testifying about some incidents of "abuse," did not give concrete evidence of any real incident or incidents that occurred for which this court can support a finding that abuse occurred.

(App. 19.) The historical conduct of DCS was not evidence presented at the hearings. As for the DCS disposition in this particular case, family case manager Gray testified that there had

been "no further need for DCS intervention" after the protective order against Boyfriend had been put in place. (Tr. 175.) She explained that the prohibition against interaction between Boyfriend and Child played a big role in the decision to find abuse unsubstantiated.[6] Indeed, the trial court acknowledged in its factual findings that "a [DCS] safety plan was put into place which essentially incorporated the use of the PO as most of the plan." (App. 16.) (emphasis added.)

Finally, the trial court seemed to be influenced by a determination in a prior proceeding that Father "had been manipulative, bossy, controlling and unreasonable in his application of the right of first refusal and the Indiana Parenting Time Guidelines."[7] (App. 17.) We reiterate, however, that the trial court made no factual finding in this case that Child had been coached or coerced to testify falsely. Mother had expressed concerns to a DCS caseworker but offered no evidence of coaching. The sole evidence of outside influences is Child's testimony that Father told her to explain certain incidents and tell the truth while Mother and Nana questioned her as to why she would lie.

In child custody determinations, the best interests of the child is paramount. Simons, 566 N.E.2d at 554. Here, the trial court determined that Mother should have continued physical custody and sole legal custody of Child in part based upon considerations extraneous to the evidence, that is, perception of DCS's historical response to child abuse allegations and Father's past aggressiveness in pursuing a right of first refusal under the Indiana Parenting

---

[6] She could not speculate on the outcome had the protective order not been in place.

[7] The parties had agreed with the trial court's request that he "take judicial notice of what apparently I already did." (Tr. 60.)

Time Guidelines ("Guidelines"). Even more troubling, the trial court declared that articulate and consistent testimony of a seven-year-old the court had found competent to testify, corroborated in several respects, was not "concrete" or "real" evidence that could "support a finding that abuse occurred." (App. 19.)

The conclusions of the trial court on the matter of custody are clearly erroneous in that they lack a "valid basis for the legal result reached." J.M., 844 N.E.2d at 599. We reverse the modification order and remand to the trial court for the entry of findings and conclusions in accordance with Trial Rule 52 on the evidence of changed circumstances and the best interests of Child.

B. Prohibition Against Parental Agreement for Additional Parenting Time

Indiana recognizes that the right of a noncustodial parent to visit his or her children is a "precious privilege." Duncan v. Duncan, 843 N.E.2d 966, 969 (Ind. Ct. App. 2006), trans. denied. A party who seeks to restrict a parent's visitation rights bears the burden of presenting evidence justifying such a restriction. Farrell v. Littell, 790 N.E.2d 612, 616 (Ind. Ct. App. 2003).

The Indiana Parenting Time Guidelines provide a "minimum recommended" schedule for parenting time but also contemplate that a non-custodial parent may exercise additional time with his or her child by parental agreement. Parenting Time Guideline Section II(A). For example, this section provides in part: "Parents should attempt to create their own parenting plan which is in the best interests of the child." Too, parental preference language is found in Section I(C)(3) of the Indiana Parenting Time Guidelines:

15

> When it becomes necessary that a child be cared for by a person other than a parent or a responsible household family member, the parent needing the child care shall first offer the other parent the opportunity for additional parenting time, if providing the child care by the other parent is practical considering the time available and the distance between residences. The other parent is under no obligation to provide the child care. If the other parent elects to provide this care, it shall be done at no cost and without effecting child support. …

The Guideline imposition of a preference for parental childcare is founded upon the premise that it is usually in a child's best interest to have frequent, meaningful, and continued contact with each parent. Shelton v. Shelton, 840 N.E.2d 835, 835 (Ind. 2006). It is presumed that the Guidelines apply in all cases which they cover; however, a trial court may, within its discretion, determine that a deviation is necessary or appropriate. Id. Any such deviation must be accompanied by a written explanation. Id.[8]

Here, without a parental request, the trial court eliminated the potential for informal agreement and arguably intended to eliminate a parent's return to court to seek formal modification:

> From this day forward, there will be no modifications of visits by either party so there should be no further issues such as the ones that have constantly arisen.

> That the husband shall have his visitation according to the Indiana Parenting Time Guidelines only. However the only exception shall be that the husband shall be allowed to pick up the child from school every Wednesday and keep the child overnight, returning the child to school the next morning.

---

[8] Effective March 1, 2013, a trial court may enter a Parallel Parenting order, which is a deviation from the parenting time guidelines, Section I, II, and III. "Its application should be limited to cases where the court determines the parties are high conflict and a Parallel Parenting Plan Court Order is necessary to stop ongoing high conflict that is endangering the well-being of the child." Parenting Time Guideline Section IV. Communication between parents is limited, except in emergencies, and the communication is usually in writing. Counseling professionals are recommended. Parallel parenting is not a permanent arrangement.

> That the court does not want to hear about any future deviations carried out by the parties and/or a violation of those agreed deviations as this court will no longer accept deviations as part of either party's agreement.

(App. 21.)

The trial court's <u>sua sponte</u> denial of the privilege of parental agreement and the right of first refusal is contrary to law.

### C. Contempt Order for Child Support Arrearage

The trial court found that Father had accumulated a child support arrearage of $2,411.00, found him to be in contempt of court, and ordered his incarceration for thirty days in the Morgan County Jail ("stayed pending complete compliance"). (App. 20.) Father does not challenge the dollar amount of the arrearage[9] but argues that a finding of contempt is erroneous where there was no evidence that he was able to pay and willfully refused to do so.

Whether a person is in contempt of a court order is a matter left to the trial court's discretion, and we will reverse a finding of contempt only where an abuse of discretion has been shown. <u>Geesy v. Geesy</u>, 959 N.E.2d 256, 258 (Ind. Ct. App. 2011). An abuse of discretion occurs where the trial court's decision is against the logic and effect of the facts and circumstances before it. <u>Id.</u>

Contempt is not an available remedy in every case where a child support deficiency exists; rather, for an obligor to be held in contempt, it must be shown that the delinquency resulted from a willful failure to comply with a support order and that the delinquent parent has the ability to pay. <u>Id.</u> (citing <u>Pettit v. Pettit</u>, 626 N.E.2d 444, 446 (Ind. 1993)).

---

[9] He points out that his January 2013 payment of $1,100.00 brought his payments current as of that date, shortly before the filing of the emergency petition.

Here, the evidence of Father's ability to pay was limited to his testimony:

Question: Your support obligation at present … is $75.00 per week, right?

Father: Yes, sir.

Question: And when you filed the petition we are now here on you didn't ask to modify that support except in the context of modifying if the custody was changed correct?

Father: I mean, I would have to read everything and be, you know, smarter on all the legal stuff, but it does need modified, I have been having trouble with it.

Question: Trouble with in [sic] as in not paying it?

Father: As in not being able to, it's not just not paying it's just being able to pay.

Question: Well that's your explanation but –

Father: No it's a fact, I can't produce what is not there and I am unable to pay that particular amount at this time.

Question: So you –

Father: I do send what I can when I can however I cannot.

Question: And you agree that weeks go by and you don't pay anything?

Father: Yeah.

(Tr. 143-44.) There being no evidence of Father's ability to pay his child support as ordered or his willful non-compliance, the order of contempt is an abuse of discretion and must be reversed.

### D. Attorneys Fees

Father argues that the trial court abused its discretion when it ordered him to pay $4,000 of Mother's attorney's fees. Pursuant to Indiana Code Section 31-16-11-1, a trial court has broad discretion to impose attorney's fees on either parent. Thompson v.

18

Thompson, 868 N.E.2d 862, 870 (Ind. Ct. App. 2007). We will reverse an order for the payment of attorney's fees only when the award is clearly against the logic and effect of the facts and circumstances before the court. Id.

The trial court may properly consider the respective resources of the parties, their financial earning abilities, and "any other factors that bear on the reasonableness of the award." Id. Moreover, the trial court may consider any misconduct on the part of a former spouse that necessitated additional legal expenses for the other party. Id.

The instant award of attorney's fees did not rest upon the respective financial conditions of the parties. Rather, the trial court concluded that Father should pay a portion of Mother's attorney's fees, referencing Father's "contempt of the custody orders and of his visitation rights." (App. 23.) The trial court made a factual finding that Father had fought for custody "in a manner that is manipulative." (App. 21.) According to the court, "while it may seem permissible for the husband to have kept the child away from the wife while the initial matter was investigated it was wholly unreasonable to keep the child from school." (App. 21.) At the same time, the trial court stated: "this court does not really raise issue with the fact this case was brought, as it is any parent's right to request a hearing when there are concerns, but this court has grave concerns over the conduct of the husband throughout." (Tr. 21.)

Clearly, the trial court considered Father's keeping Child from school to be misconduct. However, it is not clear what portion of Mother's aggregate attorney's fees is attributable to Father's decision to keep Child out of school and have her complete her work

at home for three weeks. In such circumstances, the trial court abused its discretion by awarding Mother $4,000.00 of her claimed attorney's fees. See Barger v. Pate, 831 N.E.2d 758, 765 (Ind. Ct. App. 2005) (finding an abuse of discretion where attorney's fees were awarded to one parent without distinguishing between litigation events or presenting evidence of reasonableness of the claimed fees).

## Conclusion

Father has established, prima facie, reversible error. The modification order is internally inconsistent and the conclusions of law do not rest upon adequate factual findings having evidentiary support. The sua sponte denial of parenting time agreements and opportunity for modification does not rest upon legal authority. The trial court abused its discretion by finding Father in contempt of court and ordering his incarceration for the non-payment of child support when there is an absence of evidence of his ability to pay. The award of attorney's fees is unsupported by the facts and circumstances before the trial court.

Reversed and remanded for further proceedings.

KIRSCH, J., and MAY, J., concur.