**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Aug 08 2014, 10:28 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY'S FOR APPELLANT:

**R. BRIAN WOODWARD**
Woodward & Blaskovich, LLP
Merrillville, Indiana

**MELISSA L. ROHRER**
Merrillville, Indiana

ATTORNEY FOR APPELLEE:

**MARK A. BATES**
Schererville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN RE; THE PATERNITY OF BKS, ) | |
| ) | |
| CSS, ) | |
|     Mother/Appellant, ) | |
| ) | |
|       vs. ) | No. 45A03-1311-JP-463 |
| ) | |
| RSK, ) | |
| ) | |
|     Father/Appellee. ) | |

APPEAL FROM THE LAKE CIRCUIT COURT
The Honorable Michael A. Sarafin, Special Judge
Cause No. 45C01-1210-JP-003

**August 8, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

C.S.S. (Mother) appeals the trial court's order awarding R.S.K. (Father) custody of the parties' four-year-old daughter, B.K.S. (Child). Mother raises several arguments on appeal, which we consolidate and restate as the following issue: Did the trial court abuse its discretion in awarding custody to Father?

We affirm.

At all times relevant to this appeal, Mother was married to and living with R.S. (Husband). Mother and Father were coworkers who engaged in an extramarital affair from 2003 until 2008. As a result of the affair, Mother became pregnant and gave birth to Child in 2009. During her pregnancy, Mother continued to have frequent contact with Father and Father assisted her with the pregnancy and accompanied her to medical appointments. Father visited Mother and Child at the hospital after Child's birth, and Father paid the uninsured portion of Mother's and Child's medical bills relating to the birth. After Child's birth, Mother and Father had DNA testing performed, which confirmed that Father was Child's father. Mother and Father agreed not to tell Husband the truth of Child's parentage and Father continued to assist Mother with Child's care. For the first few months of Child's life, Father had significant contact with her, including frequent unsupervised visitation at his home.

At some point after Child's birth, Mother and Father had a disagreement about Father's continued role in Child's life. In May 2010, Father retained counsel and filed a petition to establish paternity. Additionally, in accordance with the local rules of court, Father's counsel sent a letter to Mother and Husband concerning issues related to Child in July 2010. A few days later, Mother filed a petition for an ex parte order of protection

against Father, in which she alleged that she had become pregnant after Father had raped her in September of 2008. Mother also alleged that Father had attempted to rape her on another occasion and that he had stalked and harassed her. After filing the petition, Mother reported the alleged rape and attempted rape to the police.

Detective Christopher Matanovich of the Hammond Police Department investigated Mother's accusations against Father. Based on the nature and circumstances of Mother's allegations, Detective Matanovich had doubts concerning Mother's truthfulness. Detective Matanovich conducted a recorded interview of Mother on July 15, 2010. During the interview, Mother recanted her allegations against Father. Mother admitted that she had engaged in a long-term sexual relationship with Father and stated that she was afraid of Husband's reaction to her affair and its effect on her marriage. As a result of her admittedly false allegations against Father, criminal charges were filed against Mother in Lake County. Additionally, Father filed a civil lawsuit against Mother. Neither of these matters had been resolved at the time of the final hearing in this matter.

Father filed a petition for custody on July 30, 2010. In October 2010, after DNA testing was conducted and the parties entered into a stipulation, the trial court established paternity in Father. Mother was granted temporary custody of Child and Father was awarded parenting time in accordance with the Indiana Parenting Time Guidelines. Additionally, the trial court appointed Dr. Marguerite Rebesco as a custodial evaluator. Dr. Rebesco's report was filed on May 21, 2012. A two-day hearing was held on July 29 and 30, 2013. On October 30, 2013, the trial court entered a twenty-five page order

awarding sole legal and physical custody to Father, granting Mother parenting time, and granting Father's request to change Child's last name. Mother now appeals.

"Child custody determinations are within the discretion of the trial court and will not be disturbed except for an abuse of discretion." *Truelove v. Truelove*, 855 N.E.2d 311, 314 (Ind. Ct. App. 2006). Accordingly, "[w]e will not reverse unless the trial court's decision is against the logic and effect of the facts and circumstances before it or the reasonable inferences drawn therefrom." *Id.* Additionally, where, as here, the trial court enters special findings of fact and conclusions thereon pursuant to Trial Rule 52(A), we apply a two-tiered standard of review. *In re Paternity of C.S.*, 964 N.E.2d 879 (Ind. Ct. App. 2012), *trans. denied*. First, we consider whether the evidence supports the findings, and second, whether the findings support the judgment. *Id.* The trial court's findings and conclusions will be set aside only if they are clearly erroneous—that is, where a review of the record leaves us with a firm conviction that a mistake has been made. *In re Paternity of D.T.*, 6 N.E.3d 471 (Ind. Ct. App. 2014). In conducting our review, we will neither reweigh the evidence nor judge the credibility of witnesses. *Id.* Instead, we will consider only the evidence favorable to the trial court's judgment. *Id.* "To the extent that the judgment is based on erroneous findings, those findings are superfluous and are not fatal to the judgment if the remaining valid findings and conclusions support the judgment." *J.M. v. N.M.*, 844 N.E.2d 590, 599 (Ind. Ct. App. 2006) (quoting *Lasater v. Lasater*, 809 N.E.2d 380, 397 (Ind. Ct. App. 2004)) *trans. denied*.

4

Mother first takes issue with the trial court's special finding number 97, which provides as follows:

> Throughout the provisional period and despite a provisional award of joint legal custody, Mother denied Father basic information about [Child's] medical condition and care; failed to consult or include him in any way upon issues related to [Child's] education; and, and [sic] failed to provide Father with a health insurance card for [Child] until the second day of the final hearing.

*Appellant's Appendix* at 40. Mother does not dispute that she withheld information from Father; instead, she challenges the portion of the court's finding indicating that Father had been provisionally awarded joint legal custody of Child. In support of her argument, Mother notes that the trial court's October 20, 2010 order provided that Mother was "granted temporary custody of [Child]." *Id.* at 21. According to Mother, this order "clearly recognized Mother not only as physical but also legal custodian of [Child]." *Appellant's Brief* at 11. But even if we assume that Father was not provisionally awarded joint legal custody and the trial court's finding to that effect was clearly erroneous, reversal is not warranted because the remaining valid findings and conclusions support the trial court's judgment awarding sole physical and legal custody to Father.

I.C. § 31-14-13-2 (West, Westlaw current with all 2014 Public Laws of the 2014 Second Regular Session and Second Regular Technical Session of the 118th General Assembly) provides that "[t]he court shall determine custody in accordance with the best interests of the child." In making the best-interests determination, there is not a presumption favoring either parent. *Id.* Instead, the court must consider all relevant factors, including the following non-exhaustive list:

5

(1) The age and sex of the child.
(2) The wishes of the child's parents.
(3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.
(4) The interaction and interrelationship of the child with:
    (A) the child's parents;
    (B) the child's siblings; and
    (C) any other person who may significantly affect the child's best interest.
(5) The child's adjustment to home, school, and community.
(6) The mental and physical health of all individuals involved.
(7) Evidence of a pattern of domestic or family violence by either parent.
(8) Evidence that the child has been cared for by a de facto custodian, and if the evidence is sufficient, the court shall consider the factors described in section 2.5(b) of this chapter.

*Id.*

In its October 30, 2013 custody order, the trial court concluded that an award of sole legal and physical custody to Father was in Child's best interests. The order is 25 pages long and comprises over 150 findings and conclusions. The order is far too lengthy to reproduce in full here, but we will summarize its most salient points. The trial court found that most of the factors listed in I.C. § 31-14-13-2 were not significant in this case. For example, the trial court concluded that there was no credible evidence concerning Child's preferences concerning custody, and that there was no evidence of a pattern of domestic violence or any physical or psychological conditions that would impair Mother's or Father's ability to care for Child. Instead, the trial court placed particular emphasis on the parties' acrimonious relationship and inability to communicate civilly, as well as Mother's expressed wish for Father to have no relationship with Child. The court found that Mother "does not have any intention or wish to cooperatively work with Father in any way when it comes to raising [Child] and in fact wishes that Father would

6

not have any role whatsoever in [Child's] life." *Appellant's Appendix* at 38. The court found that Mother "has not taken any actions to promote Father's relationship with [Child]; has encouraged [Child] to refer to Husband as her father and not Father; and, manifested an intention to do no more than that which is ordered of her by this Court." *Id.* at 40. The court also found that Husband had a hostile attitude toward Father and was excessively involved in Mother's communications with Father and parenting-time exchanges. Although acknowledging that Father was partially to blame for his hostile relationship with Husband, the court found that "Father is more willing to work with Mother to cooperate in parenting [Child] and is more likely to work cooperatively with Mother" if awarded custody. *Id.* at 14.

The trial court also found that "[t]he evidence did not support Mother's contentions that Father raped or attempted to rape her. Still, Mother and her Husband cling to a theory that Father raped or coerced Mother into a sexual relationship and that [Child's] conception was a result." *Id.* at 39. The trial court found that "[t]he danger of exposing [Child] to Mother's and Husband's on-going belief that [Child] is the product of Father['s] rape of Mother is, as Dr. Rebesco testified, readily apparent and will cause irreparable an[d] inimical damage to [Child's] relationship with Father." *Id.*

In sum, the trial court found that the parties had a highly contentious relationship and were unable to communicate through regular channels. Mother had no intention of parenting cooperatively with Father and displayed a clear desire for Husband to replace Father in the paternal role. Perhaps most importantly, the trial court found that Father was more likely to parent cooperatively with Mother. Although the trial court noted that

7

Mother had been child's primary caregiver since her birth, it found that this circumstance was due to Mother's refusal to allow Father contact with Child beyond the minimum, court-ordered Parenting Time schedule, not a lack of interest or ability on Father's part. The court also noted that by perpetuating the idea that Child was conceived as a result of a rape perpetrated by Father, Mother was endangering Child's emotional well-being and relationship with Father. Additionally, the trial court noted that Dr. Rebesco recommended awarding custody to Father. These findings were supported by the evidence and more than sufficient to support the trial court's judgment awarding sole legal and physical custody to Father. Thus, even if the trial court's finding concerning the existence of a provisional order awarding Father joint legal custody was clearly erroneous, reversal is not required because the judgment is supported by the remaining valid findings. In light of the findings summarized above, as well as numerous other findings that are too lengthy to reproduce here, we are confident that the trial court would have reached the same result had it not made the allegedly erroneous finding concerning joint legal custody.

Mother also objects to the trial court's special finding number 93, which provides as follows:

> Mother's contention that she had been the only caregiver for [Child] does not, in and of itself, constitute sufficient grounds for her to be awarded physical custody of [Child]. Mother's contention ignores the fact that she has not afforded Father any meaningful contact with [Child] other than that which is ordered by this Court.

*Appellant's Appendix* at 39. Mother does not dispute that this finding was supported by the evidence. Instead, she argues that the trial court erred by penalizing Mother for

8

complying with the court-ordered parenting-time schedule.[1]  We disagree with Mother's premise.  Special finding number 93 does not establish that the trial court was punishing Mother for following a court order; instead, it was an explanation of the trial court's reasons for concluding that Mother's role as the primary caregiver, standing alone, was insufficient to convince the trial court that awarding custody to Mother was in Child's best interest.  The finding also reflected the trial court's overall belief that Mother was inflexible with regard to parenting time and unwilling to help foster a positive relationship between Father and Child.

Mother also complains that special finding number 93 was inconsistent with the trial court's ultimate parenting-time order.  Specifically, Mother claims that the trial court expressed disapproval for Mother's refusal to allow Father additional parenting time, but after awarding sole legal and physical custody to Father, then "restricted Mother's additional parenting time . . . by denying the opportunity for additional parenting time as permitted by the [Indiana Parenting Time Guidelines]" *Appellant's Brief* at 13.  Mother fails to note, however, that she was awarded parenting time beyond that recommended in the Guidelines.  Specifically, she was granted parenting time on alternating "weekends", with the weekend defined at Thursday at noon until Sunday at noon.  *Appellant's Appendix* at 43.  Mother was also awarded mid-week visitation on Thursdays from 9:00 a.m. until 3:00 p.m. every week that she did not have weekend visitation.  For children Child's age, the Guidelines recommend regular parenting time on alternating weekends

---

[1] Mother also argues that the trial court attributed insufficient weight to its finding that Mother had been Child's primary caregiver up until the time of the hearing.  This is nothing more than a request to reweigh the evidence, which we will not do on appeal.

from Friday at 6:00 p.m. until Sunday at 6:00 p.m., with a four-hour mid-week visit. Ind. Parenting Time Guideline II(D). Moreover, the trial court specifically noted that the parenting time schedule set forth minimum requirements and the parties were free to agree to additional time. We note that the "Opportunity for Additional Parenting Time" set forth in the Guidelines, which is often referred to as the right of first refusal, provides that a parent who needs child care "shall first offer the other parent the opportunity for additional parenting time, if providing the child care by the other parent is practical considering the time available and the distance between residences." Ind. Parenting Time Guideline I(C)(3). The trial court concluded that the Opportunity for Additional Parenting Time should not be implemented in this case because it "requires a level of communication that the parties do not possess[.]" *Appellant's Appendix* at 43. This conclusion was amply supported by the evidence and not an abuse of discretion.[2] *See In re Paternity of G.R.G.*, 829 N.E.2d 114 (Ind. Ct. App. 2005) (noting that this court will reverse a trial court's resolution of a parenting-time issue only when the trial court manifestly abuses its discretion and there is no rational basis for its decision).

Next, Mother argues that the trial court abused its discretion by drawing adverse inferences against her based on her invocation of her Fifth Amendment privilege against self-incrimination during the evidentiary hearing. Specifically, Mother invoked her rights when asked whether she had been in a long-term sexual relationship with Father and whether Father had ever raped, attempted to rape, or otherwise physically harmed her.

---

[2] For the same reason, we also reject Mother's argument that the trial court erred by requiring the parties to communicate solely by text message or e-mail.

Our Supreme Court recently discussed the impact of a witness's invocation of his or her privilege against self-incrimination in civil proceedings in *Hardiman v. Cozmanoff*, 4 N.E.3d 1148, 1152 (Ind. 2014):

> It is a bedrock principle of our criminal justice system that "no person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; *see also* Ind. Const. art. 1, § 14 ("No person, in any criminal prosecution, shall be compelled to testify against himself."). The Fifth Amendment, incorporated to the States by the Fourteenth Amendment, *Malloy v. Hogan*, 378 U.S. 1, 6, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), "not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Lefkowitz v. Turley*, 414 U.S. 70, 77, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973). A civil defendant who chooses to avail himself of this protection, however, does so at his peril: "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." *Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976); *see also Morgan v. Kendall*, 124 Ind. 454, 24 N.E. 143, 145 (1890) (holding a defendant's invocation of his Fifth Amendment privilege during his trial testimony "was a matter proper to be considered by the jury").

(footnote omitted).

In this case, the trial court explicitly stated that it had "draw[n] adverse inferences against Mother based upon her invocation of the Fifth Amendment at the Final Hearing." *Appellant's Appendix* at 38. Mother acknowledges that the trial court was entitled to draw an adverse inference, but argues that the inference was not appropriately limited. Mother asserts that the only appropriate inference the trial court could have drawn is that Mother's relationship with Father was consensual. According to Mother, "[w]hat seems apparent from the Court's findings, is that the Court drew adverse inferences in all areas

11

of Mother's testimony rather than as it pertains solely to the consensual relationship." *Appellant's Brief* at 16. As an initial matter, we note that the inference to be drawn by the trial court is not strictly limited to a finding that Mother's relationship was consensual. The trial court could also reasonably infer that Mother had falsely accused Father of rape at the time she filed the petition for a protective order and had lied to Dr. Rebesco during the custodial evaluation when she told her that Father had raped her. The court could also reasonably infer that the continued belief of Husband and his family members that Father had raped or coerced Mother was unfounded. In any event, we see nothing in the trial court's order supporting Mother's bald assertion that the trial court must have drawn inferences against Mother in all areas of her testimony. As we explained above, the trial court's conclusion that an award of sole legal and physical custody to Father was in Child's best interests was supported by numerous findings, most of which Mother does not challenge on appeal.

Finally, Mother argues that the trial court abused its discretion by awarding custody to Father in order to punish Mother for making false rape allegations against Father rather than considering the best interests of Child. Mother's argument is not supported by the evidence. As we have explained, the trial court's custody determination is amply supported by the evidence. To the extent the trial court discussed Mother's false claims of rape, it was in the context of explaining the acrimonious relationship between the parties and the negative effect exposure to such claims would have on Child. The trial court applied the appropriate statutes and expressly concluded that an award of sole legal and physical custody to Father was in Child's best interests. We will not second-

guess the trial court's conclusions in this regard based solely on Mother's unsupported allegations that the trial court was motivated by improper considerations.[3]

Judgment affirmed.

MATHIAS, J., and PYLE, J., concur.

---

[3] Mother also argues that in the event that this court reverses the trial court's custody determination, it should also remand for reconsideration of the trial court's order that Child's surname be changed to Father's. Because we affirm the trial court's custody decision in all respects, we need not address this argument.