844 N.E.2d 590 (2006)
In re the Matter of the Marriage of J.M., Appellant-Petitioner,
v.
N.M., Appellee-Respondent.
No. 64A05-0510-CV-623.
Court of Appeals of Indiana.
March 31, 2006.
*593 Debra Lynch Dubovich, Levy & Dubovich, Highland, for Appellant.
Ruth Norris, Terrell & Thrall, LLP, Valparaiso, for Appellee.

OPINION
DARDEN, Judge.

STATEMENT OF THE CASE
J.M. ("Father") appeals the order dissolving his marriage to N.M. ("Mother").
We affirm.

ISSUES
1. Whether the trial court erred in restricting Father's parenting time with the parties' minor child.
2. Whether the trial court abused its discretion in distributing the marital estate.
3. Whether the trial court abused its discretion when it ordered Father to pay certain attorney fees incurred by Mother.

FACTS
Father and Mother married on June 3, 1995. In 1996, Father graduated from law school and began practicing law. On September 20, 1998, the parties' minor son M. was born. Before the birth of M., Father sought counseling "to make [him]self a better person," which counseling continued until October of 2001, when he began therapy at the University of Chicago ("U.C.") for "longstanding" obsessive compulsive disorder. (Tr. 295, Ex. F). After being *594 treated there for about a year, Father terminated his therapy. He returned to U.C. for treatment in April 13, 2004, but then chose to terminate that treatment on June 15, 2004, with the therapist noting "poor prognosis." (Ex. F).
In late July of 2004, a partner in Father's firm found him "sobbing" and "shaking" with "his head down on his desk." (Tr. 151). Father informed the law firm that he had "an anxiety disorder" that was "getting worse," that he was "drinking to cope," and that he had been advised to seek an "extensive . . . treatment program for [his] anxiety" problems. (Tr. 154, 155). Father took leave from his employment and went on short-term disability.
Father entered an inpatient treatment program at Menninger Clinic in Texas on August 27, 2004, for "severe anxiety," obsessive compulsive disorder, major depression, and post-traumatic stress disorder as well as an "alcohol . . . problem." (Ex. E). On September 4, 2004, Father was discharged at his request, and the Clinic "recommended that he continue inpatient treatment" elsewhere. Id.
On September 8, 2004, Father began intensive therapy treatment at Linden Oaks  three-hour sessions four times a week on an outpatient basis. After four weeks, his therapist, Dr. McGrath, discharged him and advised him to follow up "as needed." (Tr. 18). In the next year, there were two sessions between McGrath and Father and several telephone conversations.
Upon his return from Texas, Father had attempted a return to work. However, shortly thereafter he decided he no longer wanted to work for the law firm and terminated that relationship. Father chose to remain unemployed for six months; he then began work with another law firm in 2005.
In the meantime, on October 15, 2004, Father had filed a petition for dissolution. On October 27, 2004, with counsel, the parties entered into an agreed provisional order. The order provided parenting time for Father but specified that Father "shall not consume alcohol either before his parenting time or during his parenting time"; and that if Mother "reasonably believe[d]" he was "impaired as a result of alcohol consumption," she had the right to cancel the visit unless Father submitted to a breathalyzer test administered by law enforcement and the results showed no more than a .02 blood alcohol content. (Father's App. 72). Father was not ordered to pay child support, but any "income from whatever source" was to be deposited in the parties' joint checking account for payment of marital bills. Id. at 73. Further, Father's use of the joint checking account was limited to paying "monthly rent and drycleaning expenses," and his credit card usage was also limited to specific enumerated purposes. Id. According to the order, the amount of "additional credit card purchases. . . other than those mentioned" would be "deducted from" Father's "share of the marital estate." Id. The provisional order also reflected the parties' agreement that Linda Lakin would be appointed as Guardian ad Litem ("GAL") for M.
On January 14, 2005, Mother filed a verified petition for a protective order and a verified petition to modify parenting time. The former alleged instances in which Father appeared to have consumed alcohol and forcibly, over Mother's objection, took M. from the marital residence; berated M. after a soccer practice  severely affecting M.; and displayed an explosion of rage in the kitchen of the marital residence. The petition to modify repeated these allegations, asserted that Father's "various mental health and/or alcohol issues interfere with his ability to properly discipline and interact with [M.] *595 in an age appropriate manner," and stated that "while [Mother] desires that [Father] maintain a relationship with [M.], it is in [M.]'s best interest for parenting time to be conducted in a therapeutic setting." (Mother's App. 84). Mother then asked that Father's parenting time "be supervised by Choices," a counseling service. Id. A hearing was set on these petitions for January 24, 2005.
On January 24, 2005, the parties presented the trial court with an agreed order for modification of parenting time. Signed by both parties, the order provided that Father's parenting time would be supervised by Choices, "in a manner approved of by" the GAL, and that the parties would "follow the recommendations and requests of Choices and the" GAL regarding parenting time issues. (Father's App. 83). The order also stated that Father denied the allegations of Mother's petition for an order of protection, and Mother maintained that it was accurate, but that "in exchange for" Father's agreement not to enter the marital residence unless invited by Mother and to "supervised parenting time at Choices," Mother would dismiss her petition. Id. at 84.
A week later, on February 1, 2005, Mother filed a verified petition for modification of the provisional order. Mother alleged that Father had failed to limit his use of the joint checking account or credit card as ordered, and "due to [his] continuing unemployment," she was effectively paying all of his expenses as well as her own. (Father's App. 87). Mother sought a modification to require Father "to be responsible for an equitable share of the marital bills and his own living expenses." Id. Mother also filed a verified petition alleging that Father had failed to deposit monies in the joint account and had written checks that failed to comply with the existing order.
On March 7, 2005, a mediator was appointed. The parties met with the mediator twice in April and once in May; the GAL attended two of these sessions. The sessions resulted in the adoption of two partial mediation agreements, filed with the court on May 19, 2005, which resolved a number of issues and provided that Father was to pay child support beginning on May 1st. There was no resolution of the alleged inappropriate use of checks and credit cards by Father.
Father's supervised parenting time with M. at Choices initially went well, and in May of 2005, Choices, the GAL, and the parties agreed to a three-step transition to unsupervised parenting time. The date of June 21, 2005 was the last occasion of the second-step arrangement, whereby Father would meet M. at Choices, take him away and spend a set amount of parenting time, then return to Choices, at which point he, and then M., would meet individually with the Choices counselor. During their time together, Father took M. to the library. M. told Father he had a loose tooth. Father tried to pull out the tooth. When he could not do so with his fingers, he asked the librarian for a pair of scissors and took M. into the bathroom and tried to pull the tooth out with the scissors. M. was crying and asked Father to stop, but Father continued to try to pull the tooth. On return to Choices, Father did not wait to meet with the counselor. M. told the counselor "that his dad had scared him" and described the incident. (Tr. 191). The counselor and Mother both observed that M. was "very withdrawn" and clinging to Mother, and he "kicked [a] brick really hard" on his way out, "unusual behavior for him." (Tr. 192). The counselor heard nothing from Father until June 27th, when he called to tell her that he would no longer seek parenting time with M. When the counselor tried to discuss the tooth *596 incident, Father "didn't deny that it happened." (Tr. 194).
In mid-August, the parties informed the trial court that they had agreed to submit to binding arbitration pursuant to the Family Law Arbitration Statute. See Ind. Code § 34-57-4-1 et seq. (P.L. 112-2005, effective July 1, 2005). Daniel A. Gioia, a family law practitioner for thirty years, was appointed family law arbitrator ("the Arbitrator").
The Arbitrator met with the parties and GAL on August 18, 2005, at which time the parties "agreed that any time limits regarding exchange of exhibits[1] were waived and that they would allow all exhibits to be admitted into evidence." (Decree, p. 1). It was further agreed that there would be a separation of witnesses. Father objected to the GAL's participation in the arbitration process, and the Arbitrator overruled his objection.
The Arbitrator held two full days of hearings on August 25 and 26, 2005. Before the hearings began, Father reminded the Arbitrator of his objection to participation by the GAL in the proceedings. During the proceedings, the GAL was allowed to cross-examine witnesses. By the time he wrote his findings of fact and conclusions of law,[2] the Arbitrator had received the parties' filings with the trial court, the trial court's orders, and sixty exhibits.
Dr. McGrath, who had most recently treated Father in the Linden Oaks program, testified that Father had "successfully completed" his therapy in October of 2004, and any further therapy would be "up to the patient." (Tr. 18, 29). When asked how Father was currently doing, McGrath stated that "according to what he has told me, he appears to be doing very well." (Tr. 23). When asked whether he had heard anything from Father that would make him "think he could be a danger to his child," McGrath answered, "No, not that he would physically be a danger." Id.
Father's treatment records from U.C., Menninger Clinic, and Linden Oaks were submitted to the Arbitrator. All make repeated references to Father's alcohol consumption. Since his September 8, 2004 discharge from Linden Oaks, Father had been on three prescription medications: Klonopin, Celexa, and Seroquel. Father tendered an alcohol assessment conducted on July 28, 2005, which stated that "based on the information gathered," Father was not an alcoholic. (Ex. 4). The assessment noted that Father's "report[ed] last usage of alcohol" was eight days earlier, when he had consumed ten beers during a twelve-hour period. Id.
Draga Beckner, the counselor from Choices, testified to M.'s account of the loose tooth incident and how M. had been "emotionally distressed" by the incident. (Tr. 199). Beckner recommended that Father's future parenting time with M. take place "in a therapeutically supervised format" because she had concerns for M.'s safety. (Tr. 196). According to Beckner, *597 parenting time "should be supervised when there's any indication of emotional issues with the child," and M. "could potentially be at risk for emotional issues due to the behavior that was presented" by Father. (Tr. 198, 199). Another counselor at Choices, who had supervised parenting time between Father and M., testified that she "would worry about [M.]'s emotional health" if Father's parenting time was unsupervised. (Tr. 240). A report from the Choices counselors was included in the GAL report submitted to the Arbitrator; it recommended therapeutically supervised parenting time, and that Father undergo a psychological evaluation to include a drug and alcohol assessment.
Father's counsel explained[3] that Father had only ceased participation in the parenting time arrangement at Choices because he thought the arrangement was upsetting M. Father testified that to continue the arrangement would be "perpetuating. . . harm" to M. (Tr. 362). Father sought unsupervised parenting time consistent with the guidelines.
Mother testified about her initial observation of Father's compulsive behavior after M.'s birth. She further testified that Father's "rages" increased in 2003, and that in 2004, Father began staying out late or all night drinking. (Tr. 424). Mother described how Father was "often screaming and yelling at [M.] . . . over little things," and would provoke M. to tears by "call[ing] him a baby." (Tr. 427). According to Mother, M. was devastated when Father stopped participating in parenting time. Mother explained that she sought supervised visitation and an alcohol and psychological evaluation of Father not because she wanted "to keep [M.] apart from his dad" but "to keep [him] safe." (Tr. 439). Finally, Mother asked that she be reimbursed after the sale of the marital residence for mortgage payments she made after the parties' separation when Father was not contributing anything in support of the family and household, and to be reimbursed one-half the amount of Father's unauthorized check and credit card expenses.
The GAL tendered her final report to the Arbitrator, at which time Father made a series of objections based on the Rules of Evidence. The Arbitrator noted that no such objection had been raised by Father during the course of the August 18th meeting, which "discussed all of the matters" and, at which time, Father only objected to the GAL's "participation in asking questions"; the Arbitrator overruled Father's objection. (Tr. 290, 291). The GAL testified that she had consistently recommended that Father undergo an evaluation about "alcohol and medication." (Tr. 519). The GAL's report described M.'s account of the evening in November of 2004 when Father "loudly berated [M.] regarding [M.]'s performance during" his soccer game, and "screamed" at him "for a long time." (Ex. I). It also described M.'s account of the loose tooth incident; it reported that when the GAL discussed the incident with Father, he "stated that dentists use needle-nose pliers, and that if he had had those he would have used them and nothing would have been wrong with that." Id. The report concluded with the recommendation that Father's parenting time be supervised at Choices. Father's counsel questioned the GAL extensively on her report.
On September 15, 2005, the Arbitrator submitted to the trial court a decree of *598 dissolution with written findings of fact and conclusions of law, which the trial court signed and made an order of the court that same day. The thirty-one page decree cited to witnesses' testimony and the exhibits submitted (including Father's medical records) and included observations made by the Arbitrator. Finding that Father's actions had "been adverse to the best interests of his minor son, [M.]," and his "behavior continue[d] to be detrimental to the mental health, well being, and emotional stability and development" of M., and that Father had been unwilling to "complete a psychological evaluation including a drug and alcohol assessment," the Arbitrator concluded that Father "must be restricted to supervised visitation with his son under the current order until further notice." (Decree at 20, 21). Accordingly, it was ordered that Father
have therapeutic parenting time with [M.] through Choices, and shall continue until it is determined that unsupervised parenting time would not endanger the child's physical health or significantly impair the child's emotional development;
and that Father "have a complete psychological evaluation completed by a qualified professional" and which "include[s] a comprehensive alcohol and drug assessment"; and that Father "follow all recommendations made based upon the evaluation." (Decree at 28).
The Arbitrator further found that based on the parties' incomes, "a 50/50 split of the marital estate is equitable." Id. at 23. However, the decree thereafter specified certain setoffs. Because Mother had "solely paid the mortgage payment, without contribution from [Father] since January of 2005," which "reduced the principal on the mortgage by a total of $5,421.00 between January 2005 and July 2005," that amount was to be "returned to her upon the sale of the residence before equally dividing" the remaining proceeds.[4]Id. at 25. Next, because Father wrote checks from the parties' checking account "in violation of the provisional order," Mother was to be "reimbursed one-half the sum of the money he spent in violation of the order, or $1,122.30," to be paid from Father's share of the marital home sale proceeds. Id. at 26. Further, because Father incurred substantial credit card charges,[5] and the agreed provisional order had provided for "the reallocation of provisional expenses," Father was ordered to "reimburse [Mother] one-half the excess purchases he made on his credit card in the amount of $5,127.00," with such payment to be made from his share of the marital home sale proceeds. Id. The decree also provided that Father be solely responsible for the $5,105.00 balance on his law school loan.
Finally, regarding fees incurred by Mother related to "Father's contempt of court," (with respect to his "refusal to comply with" the provisional order), additional mediation (required after Father failed to attend one "`parties only'" mediation), his taking M. after refusing to take a breathalyzer test, "for collection of checks [Father] refused to turn over, and other issues [Father] controlled," Father was ordered to "contribute the amount of $3,675.00" towards Mother's attorney fees. (Decree at 27).

*599 DECISION

1. Supervised Parenting Time

Consistent with the statutory mandate, the Arbitrator made findings of fact and conclusions of law. See I.C. § 34-57-5-7. These were then entered as a judgment by the trial court. Id. When findings of fact and conclusions of law are entered by the trial court, we will not set aside the judgment unless it is clearly erroneous; that is, unless we are definitely and firmly convinced the trial court committed error. Lasater v. Lasater, 809 N.E.2d 380, 396 (Ind.Ct.App.2004).
The findings must disclose a valid basis for the legal result reached in the judgment, and the evidence presented must support each of the specific findings. We defer to the trial court when such evidence conflicts. We will neither reweigh the evidence nor reassess the credibility of the witnesses before the court. Rather, we will affirm if there is sufficient evidence of probative value to support the decision, viewing the evidence in the light most favorable to the judgment and the reasonable inferences drawn therefrom. To the extent that the judgment is based on erroneous findings, those findings are superfluous and are not fatal to the judgment if the remaining valid findings and conclusions support the judgment.
Id. at 396-97.
When we review a trial court's determination of a parenting time issue,[6] we reverse only when the trial court manifestly abuses its discretion. Id. at 400. No abuse of discretion occurs if there is a rational basis in the record supporting the trial court's determination. Id. We will neither reweigh evidence nor judge the credibility of witnesses. Id. In all parenting time controversies, courts are required to give foremost consideration to the best interests of the child. Id.
Father begins by directing us to Indiana Code section 31-17-4-1(a), which provides that a parent
not granted custody of the child is entitled to reasonable parenting time rights unless the court finds, after a hearing, that parenting time by the noncustodial parent might endanger the child's physical health or significantly impair the child's emotional development.
According to Father, the decree is erroneous as a matter of law because it does not contain an express finding or conclusion that visitation by Father would endanger M.'s health or significantly impair his emotional development. We cannot agree.
At first blush, Father's argument appears unduly semantic, but we agree that Farrell v. Littell, 790 N.E.2d 612 (Ind.Ct. App.2003), can be read to so hold. However, Farrell is critically distinguished by the fact that therein no parenting time was granted to the noncustodial parent. Farrell held that because (1) the trial court "did not make a specific finding that [parenting time] would endanger [the child]'s physical health or well-being or significantly impair [the child]'s emotional development," and (2) the evidence presented "would not have permitted a finding that" parenting time by the noncustodial parent "would endanger [the child]'s physical health or well-being or significantly impair [the child]'s emotional development," the order denying parenting time was erroneous. Id. at 616, 617.
*600 Here, Father was not denied parenting time; rather, his parenting time was ordered to be supervised and within certain parameters designed to protect the best interests of M. Moreover, although there is no express finding that unsupervised parenting time "would significantly impair [M.]'s emotional development," I.C. § 31-17-4-1(a), evidence was presented that would support that conclusion. Specifically, the evidence showed that M. had been so devastated by Father's tirade after soccer that he reverted to bedwetting; and, that after Father's attempt to pry out his loose tooth with scissors, M. was left in fear of Father. Moreover, the finding that Father's "behavior continues to be detrimental to the mental health, well being, emotional stability and development" of M. is tantamount to a finding that unsupervised parenting time would significantly impair M.'s emotional development. (Decree at 20). Therefore, we find this argument to fail. See Duncan v. Duncan, 843 N.E.2d 966 (Ind.Ct.App.2006).
Father also argues that some of the findings "unduly malign[] and maliciously castigate[]" him and "have no relationship to the evidence in the Record or the reasonable inferences therefrom." Father's Br. at 20. We can acknowledge that some of the findings may draw tenuous inferences; nevertheless, support for most of the findings can be found in the voluminous medical records, and other findings may be superfluous[7] to the ultimate judgment reached. See Lasater, 809 N.E.2d at 396. Essentially, Father contends that because his most recent therapist, McGrath, testified that Father had successfully completed his therapy program in 2004, this testimony necessarily supersedes all evidence of his prior diagnoses and treatment observations. Such an argument asks that we reweigh the evidence, which we do not do. See Lasater, 809 N.E.2d at 396. McGrath did not testify that Father was "cured" of his mental and emotional problems. Further, McGrath stated that it would be "a concern" if Father consumed alcohol along with his prescribed mediation  a scenario which had occurred in 2005 according to the record. (Tr. 30). Finally, when asked if he thought Father "could be a danger to his child," McGrath qualified his response when he answered, "No, not that he would physically be a danger." (Tr. 23, emphasis added).
Father next argues that the decree as to parenting time must be reversed because the GAL was "erroneously allowed to examine and cross-examine witnesses." Father's Br. at 25. Father asserts the lack of statutory authority for this role. Again, we cannot agree.
Indiana law defines a GAL as, inter alia, "a volunteer . . . who is appointed by a court to represent and protect the best interests of a child; and provide the child with services requested by the court, including researching; examining; advocating; facilitating; and monitoring the child's situation." I.C. § 31-9-2-50. During the course of a dissolution proceeding, a court may appoint a GAL "for a child." I.C. § 31-15-6-1. The GAL "shall represent and protect the best interests of the child." I.C. § 31-15-6-3. Further, the GAL is considered an "officer of the court for the purpose of representing the child's interests." I.C. § 31-15-6-5. Also, a GAL "may subpoena witnesses and present evidence regarding the supervision of the action, or any investigation and report that the court requires of the" GAL. I.C. *601 § 31-15-6-7. In addition, a GAL "may be represented by an attorney." I.C. § 31-15-6-6. Moreover, we have held that the GAL "is a party to the proceedings." Carrasco v. Grubb, 824 N.E.2d 705, 710 (Ind. Ct.App.2005), trans. denied (quoting Deasy-Leas v. Leas, 693 N.E.2d 90, 93 (Ind.Ct.App.1998), trans. denied).
Provided that a trial court fulfills its duty to conduct trials expeditiously and consistent with the orderly administration of justice, a trial court has discretion to conduct the proceedings before it in any manner that it sees fit. Hoang v. Jamestown Homes, Inc., 768 N.E.2d 1029, 1035 (Ind.Ct.App.2002), trans. denied. We review the decisions that a trial court makes regarding the conduct of the proceedings for an abuse of that discretion. Id.
It is undisputed that the GAL herein was properly appointed, and that Father agreed to her appointment in the initial agreed provisional order. Inasmuch as the statute authorizes representation of the GAL by an attorney, it is arguable that such authority inherently includes the GAL's ability to examine and cross-examine witnesses. Further, the GAL's participation in the arbitration hearings was of a nature encompassed by her authority as an "officer[] of [the] court," to "research[], examin[e], advocat[e], facilitat[e], and monitor[]" M.'s "situation" from the time of her appointment through the hearings in order "to represent and protect [his] best interests" as a determination on parenting time was being made. I.C. §§ 31-15-6-5, 31-9-2-50, 31-15-6-3. Therefore, we conclude that the GAL's participation in the arbitration hearings was within statutory authority, and we find no abuse of discretion here.
Next, Father argues that because
the parties had agreed to a witness separation order and because the statute did not allow for participation by the [GAL], the Arbitrator abused his discretion by allowing the [GAL] to be present during the arbitration proceeding in any capacity other than a witness and in allowing her to examine and cross-examine witnesses.
Father's Br. at 28. Having found no error in the GAL's participation in the arbitration proceeding, and noting that a GAL is "a party to" such a proceeding, Carrasco, 824 N.E.2d at 710, we find no merit in the contention that her presence was barred by the separation of witnesses order.
Father also argues the GAL's improper participation is evidenced by what he alleges was a breach of confidentiality by the GAL. According to Father, after the arbitration hearing, the GAL allegedly questioned Father's witness who had testified that Father had inquired of her about a man who had allegedly tousled M.'s hair in the restaurant where she worked, and she had informed Father that the restaurant manager told her that the man was a sex offender. The Arbitrator found that Father's allegation was either an attempt to impeach the GAL or to disqualify her from acting as a GAL in the future, and that Father's allegations were without merit. We must agree, and we fail to find that the GAL's alleged post-arbitration action renders her participation in the arbitration proceeding improper. Furthermore, we find that Father's argument lacks merit, and he fails to show any prejudice he suffered as a result of the GAL's alleged post-arbitration questioning of this witness.
Finally, Father argues that his objections at the arbitration hearing to the admission of the GAL's report based upon Rule 602, Rule 701, Rule 702, and Rule 702(B) of the Indiana Rules of Evidence were erroneously overruled. As the Arbitrator noted, Father had posed no such *602 objections at the August 18th pre-arbitration meeting, at which time the admission of the report was discussed. Further, Father had the opportunity to question the GAL extensively about the contents of her report, and to use statements therein in his questioning of other witnesses.
Traditional rules of evidence do not always apply in arbitration proceedings. See A.D.R. 3.4(D); see also Slaney v. Intern. Amateur Athletic Federation, 244 F.3d 580, 593 (7th Cir.2001), ("the Supreme Court has noted that `arbitrators are not bound by the rules of evidence.'" (quoting Bernhardt v. Polygraphic Co., 350 U.S. 198, 203-04 n. 7, 76 S.Ct. 273, 100 L.Ed. 199)). As Mother observes, of the 103 findings of fact made by the Arbitrator, only two are based solely on the GAL's recommendations. Thus, even if the GAL's report and testimony were erroneously admitted, sufficient evidence from other sources supports the parenting time determination. We do not find that Father's evidentiary objections and argument require reversal of the parenting time determination.

2. Disposition of Marital Assets

The division of marital assets lies within the sound discretion of the trial court, and we will reverse only for an abuse of that discretion. Woods v. Woods, 788 N.E.2d 897, 900 (Ind.Ct.App.2003). An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances presented. Daugherty v. Daugherty, 816 N.E.2d 1180, 1187 (Ind.Ct.App. 2004). When we review a challenge to the trial court's division of marital property, we may not reweigh the evidence or assess the credibility of witnesses, and we will consider only the evidence most favorable to the trial court's disposition of marital property. Woods, 788 N.E.2d at 900. Moreover, the challenger must overcome a strong presumption that the court considered and complied with the applicable statute, and that presumption is one of the strongest presumptions applicable to our consideration on appeal. Id.
The Family Law Arbitration statute provides that the family law arbitrator "shall divide the property of the parties" and do so in compliance with Indiana Code section 31-15-7-5. I.C. § 34-57-5-9. Indiana Code section 31-15-7-5 provides that in dividing marital assets upon the dissolution of a marriage, the presumption is "that an equal division of the marital property between the parties is just and reasonable."
Father argues that the trial court abused its discretion because after "finding that an equal division of the marital estate in this case was just and reasonable and that there was no reason to deviate from that equal division," the trial court's order then "erroneously deviated from that presumption." Father's Br. at 10, 11. Such deviation, he contends, occurred when it ordered (1) Mother's reimbursement for her payments made to reduce the principal owed by the parties on the marital residence; (2) reimbursement to Mother for one-half the amount of checks Father wrote on the parties' checking account in violation of the agreed provisional order; (3) reimbursement to Mother for one-half the amount of excess credit card charges made by Father in violation of the agreed provisional order; and (4) Father to be solely liable on his $5,105.00 law school loan.
Our Supreme Court "has made clear that the trial court has discretion when valuing the marital assets to set any date between the date of filing the dissolution petition and the date of the hearing." Quillen v. Quillen, 671 N.E.2d 98, 102 (Ind.1996). According to the evidence submitted *603 by Mother, at the time Father ceased contributing to the payment of household expenses in December of 2004, there was a principal balance of $165,989.00 owed on the parties' mortgage; after her payments through July of 2005, this principal balance had been reduced by $5,421.00. When the trial court ordered Father to reimburse Mother $5,421.00, it was effectively valuing the marital estate as of December 2004. Consistent with Quillen, the use of this date was not an abuse of its discretion. Therefore, by ordering Father to reimburse Mother for payments solely made by her to reduce the principal balance, the trial court did not effect a deviation from the presumption of an equal division.
The same reasoning applies to the trial court's order with respect to the reimbursement ordered for one-half of the excessive checks and credit card charges made by Father. If Father had complied with the agreed provisional order as to the writing of checks, and if he had not used the credit card for charges  evidenced by detailed bills  found by the trial court to be excessive, the marital estate would have been larger by twice the amount that Father was ordered to reimburse Mother. The order that he reimburse her one-half that amount serves to effect an equal division of the marital estate intended by the trial court.
In his summary of the arguments, Father cites his $5,105.00 law school loan as an impermissible deviation from the equal split. He does not further mention this in his appellate brief; in his reply brief, he simply asserts that there is no finding to "justify that deviation." Reply at 20. The trial court found that because Father would "retain all of the benefit of his law school education," he should "be solely responsible for this debt without offset to the marital estate." (Decree p. 27). This finding is sufficient to support the trial court's order that Father be solely responsible for the liability. The result is a slight deviation from a perfectly equal division  49.117% to Father, and 50.883% to Mother. However, our Supreme Court has held that "express trial court findings will not be compelled for insubstantial deviations from precise mathematical equality" in the division of the marital estate. Kirkman v. Kirkman, 555 N.E.2d 1293, 1294 (Ind.1990). We find this to be such an insubstantial deviation and "decline to remand to the trial court for further specific findings." Id.

3. Attorney Fees

In an action for dissolution of marriage, the trial court is authorized to "order a party to pay a reasonable amount for the cost to the other party of maintaining or defending" the litigation. Stratton v. Stratton, 834 N.E.2d 1146, 1152 (Ind.Ct. App.2005) (citing I.C. § 31-15-10-1). The trial court enjoys broad discretion in assessing attorney fees in dissolution cases. Goodman v. Goodman, 754 N.E.2d 595, 602 (Ind.Ct.App.2001). In deciding whether to make an award of attorney fees, the court should consider the resources of the parties, their economic condition, their ability to engage in gainful employment, and any other factors that bear on the reasonableness of the award. Id. Misconduct that directly results in additional litigation expenses may properly be taken into account in the trial court's decision to award attorney fees in the context of a dissolution proceeding. Id. at 602-03 (quoting In re Marriage of Lewis, 638 N.E.2d 859, 861 (Ind.Ct.App.1994)).
The trial court's decree states that Father had been found in contempt of court. It ordered that for his
contempt of court, for additional fees that [Mother] incurred unnecessarily in *604 mediation, for collection of checks [Father] didn't turn over, and other issues [Father] controlled, [Father] should contribute the amount of $3,6750.00 towards [Mother]'s attorney fees.
(Decree at 30).
Father argues that this award is an abuse of discretion because two of the trial court's reasons are "clearly erroneous." Father's Br. at 39. Specifically, Father contends there "was no evidence of Father's conduct during" the mediation sessions and that the allegations of Mother's petition for protective order cannot be considered because it "was never litigated and was voluntarily withdrawn." Id. Again, we cannot agree.
As we stated in In re the Marriage of Pulley, 652 N.E.2d 528 (Ind.Ct.App.1995), trans. denied, the trial court "need not . . . give reasons for its determination" to make an award of attorney fees. Id. at 532 (citing Crowe v. Crowe, 555 N.E.2d 180, 182 (Ind.Ct.App.1990)). Here, the trier of fact heard testimony over the course of two days, including that of the parties; it reviewed their court filings and considered volumes of exhibits. At the conclusion, Father was found to be "in contempt" for his "refusal to comply" with the agreed provisional order, and to have made credit card charges which "were frivolous and unnecessary, especially in light of the fact that he was unemployed during that time period." (Decree at 26). In another finding, the Arbitrator found Father "failed to be available" for a special mediation session, which required "several extra hours in mediation." Id. The decree further found that Mother "incurred additional attorney fees" when she filed for a protective order after Father "snatch[ed] the child from the home after he refused to take a breathalyzer." (Decree at 27). Father's counsel agreed that Mother's petition for a protective order was "part of the record." (Tr. 301). Further "additional attorney fees" were found to have been incurred by Mother in "trying to resolve the issues of checks [Father] refused to turn over" before the arbitration hearing. (Decree at 27).
Mother submitted an attorney fee exhibit reflecting the fees related to the above  detailed as to date, time required, and subject matter. The time totaled twenty-one hours, for which her attorney billed Mother $3,675.00.
Based upon the initial factors enumerated in Goodman, the parties were in near equipoise as to their ability to pay their own attorney fees. 754 N.E.2d at 602. However, the award herein is limited to those fees incurred by Mother based on specific unreasonable actions by Father that caused Mother "additional litigation expenses." Id. Therefore, an award in an amount to reasonably reimburse Mother for those additional expenses is one within the trial court's discretion. Accordingly, we do not find the order directing Father to pay $3,675.00 for attorney fees incurred by Mother to be an abuse of discretion.
Affirmed.
KIRSCH, C.J., and SULLIVAN, J., concur.
NOTES
[1] The Family Law Arbitration statute does not contain a provision regarding the exchange of submissions, but it does state that the "Rules for Alternative Dispute Resolution apply to family law arbitration in all matters not covered. . . ." I.C. § 34-57-5-13. Indiana Alternative Dispute Resolution Rule 3.4(B) provides that materials "the parties desire to be considered in the arbitration process shall be filed" with the arbitrator and with attorneys of record no later than fifteen days prior to any hearing relating to that which the material concerns.
[2] The statute requires the arbitrator to make "written findings of fact and conclusions of law," and the trial court then "shall enter judgment." I.C. § 34-57-5-7.
[3] The arbitration procedure allows counsel to "make oral presentation of the facts supporting a party's position." A.D.R. 3.4(D).
[4] At the time of the hearings before the Arbitrator, the parties had entered into an agreement whereby the marital residence would be sold for $320,000, with the closing scheduled for September 15, 2005  the date the trial court entered its dissolution order.
[5] The charges were to a joint credit card, which was paid from their home equity line of credit. (Order at 26).
[6] Indiana's Parenting Time Guidelines, adopted December 22, 2000, and effective March 31, 2001, use the words "`parenting time' . . . instead of the word `visitation' so as to emphasize the importance of the time a [non-custodial] parent spend[s] with a child." Ind. Parenting Time Guidelines, Preamble Commentary 1.
[7] For example, one finding states that Father's current medications include Lithium, and Father insists that he is not taking Lithium  directing us to McGrath's testimony that he "believe[d]" the Lithium "had been discontinued." Tr. 20.