## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



ATTORNEY FOR APPELLANT

Cassandra Hine
San Pierre, Indiana

ATTORNEYS FOR APPELLEE

Brian M. Smith
Merrillville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Dennis Challoner,<br>*Appellant-Respondent,*<br><br>v.<br><br>Wendy Challoner,<br>*Appellee-Petitioner.* | September 12, 2019<br><br>Court of Appeals Case No.<br>18A-DR-1241<br><br>Appeal from the Porter Superior Court<br><br>The Honorable Roger Bradford, Judge<br><br>The Honorable Mary DeBoer, Magistrate<br><br>Trial Court Cause No.<br>64D01-1601-DR-694 |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Respondent, Dennis Challoner (Father), appeals the trial court's Decree of Dissolution of Marriage (Decree) dissolving his marriage to Appellee-Petitioner, Wendy Challoner (Mother).

We affirm.

# ISSUES

Father presents three issue on appeal, which we restate as:

(1) Whether the trial court abused its discretion by imputing income to Father;

(2) Whether the trial court abused its discretion by not holding Mother in contempt for violating a parenting time order; and

(3) Whether the trial court abused its discretion in distributing the marital estate.

# FACTS AND PROCEDURAL HISTORY

Father and Mother married on February 23, 2013. One child, J.C. (the Child), was born during the marriage. At the time, the parties were residents of Porter County, Indiana. On January 27, 2016, Mother filed a verified petition for dissolution of marriage and requested a hearing on provisional orders. An agreed provisional order (Provisional Order) was entered on March 28, 2016 wherein, among other things, Mother was granted temporary sole legal and

physical custody of the Child; Father was to exercise parenting time every other weekend from Friday 4:30 p.m. to Sunday 6:00 p.m.; and Father was ordered to pay child support of $130 per week.

[5] Father has historically had income tax liabilities with the Internal Revenue Service (IRS) and Indiana Department of Revenue (IDR). Between 2013 and 2014, Father had accrued an outstanding tax liability of $10,000.63. On the other hand, Mother has no outstanding tax liabilities, and she timely files her federal and state income tax returns. In 2013, 2014, and 2015, Mother timely filed her federal and state tax returns. In all those filings, Mother designated her status as married filing separately, and she received tax refunds from those filings, which she used to pay off marital obligations.

[6] In the Spring of 2016, without Mother's knowledge, Father filed amended tax returns for 2013 and 2014. In that amendment, Father indicated that he was filing as married filing jointly. As a result of that amendment, for the 2013 tax year, the IRS issued a tax refund of $6,637, and IDR issued a refund of $555.48. The "State of Indiana intercepted the tax refund and applied it to Father's outstanding child support" for his two children from his previous marriage, and to Father's other "outstanding tax obligations owed to the State of Indiana." (Appellant's App. Vol. II, p. 26). After paying those obligations, the parties were provided with the "remaining $1,124.37 of the refund." (Appellant's App. Vol. II, p. 35). When Mother became aware of Father's tax filing, she contacted the IRS and IDR and complained that she had not consented to the amended tax return filed by Father.

On May 26, 2016, Mother filed a Motion to Set Hearing on Tax Refunds. Following a hearing on June 8, 2016, the trial court issued an order on July 18, 2016, reserving its ruling on issues pertaining to the parties' tax returns until the final hearing, however, the trial court ordered the balance of the tax refund, the sum of $1,124.37, to be deposited into Mother's counsel's trust account. The trial court also ordered among other things, that Father should not have any contact with Mother during the pendency of the dissolution proceedings, and all parenting time exchanges should occur at the Porter County Sherriff's Department. Shortly after the hearing, and before the entry of the no-contact order, Father hacked into Mother's email account, and posing as Mother, attempted to "fire" Mother's divorce attorney. (Appellant's App. Vol. II, p. 42). Father then sent a series of harassing text messages to Mother between July 1 and July 6, 2016. On August 22, 2016, Mother filed a motion for temporary and permanent restraining order (TRO), alleging that Father had violated the no-contact order since Father had on numerous occasions harassed her through text messages.

On October 25, 2016, the trial court appointed Scott Wagenblast to serve as the Guardian *Ad Litem* (GAL Wagenblast) and to investigate and file recommendations with the court regarding custody and parenting time. On October 31, 2016, pursuant to another order, the parties stipulated that GAL Wagenblast would have the authority to act in the following manner: (1) recommend that one or both parties undergo co-parenting classes (2) recommend that one or both parties perform anger management counseling and

(3) recommend either party undergo a psychological evaluation to determine fitness for parenting. The parties also agreed to comply with any of GAL Wagenblast's recommendations. Further, exchanges for purposes of parenting time were moved to Family House in Valparaiso, Indiana.

[9] On the same day, and by a separate order, the trial court entered an Order of Permanent Injunction in which Father was enjoined from threatening or harassing Mother, entering the marital home or Mother's place of work, contacting Mother's family, slandering Mother, or hacking into Mother's email account. On December 2, 2016, GAL Wagenblast filed his interim report with the trial court and recommended, among other things, that the parties undergo psychological evaluations.

[10] On May 10, 2017, the parties agreed to participate in mediation, but during a four-hour mediation session that occurred in July 2017, Father "stormed out." (Tr. Vol. III, p. 81). In that same month, Father was evicted from his home. Father's mother either bought or gave Father some money to buy a large camper which he was able to place in the backyard of a friend's home. Father failed to disclose his new location to Mother, and that prompted Mother to file a Verified Petition to Modify Parenting Time, where Mother requested Father's parenting time to be supervised since Father had refused to disclose his new address. Around this time, the Department of Child Services (DCS) opened a case against Father alleging that there were bedbugs in Father's home. In late June 2017, DCS closed its case after determining that the allegations were unsubstantiated. Mother's attorney sent interrogatories to Father's attorney to

flesh out the details of the DCS's investigation and facts pertaining to Father's eviction from his apartment. Those interrogatories went unanswered. During this time, Mother denied Father parenting time on several occasions.

[11]     Sometime in June or July 2017, while awaiting a hearing on her motion to modify parenting time, Mother contacted GAL Wagenblast and requested that he investigate Father's living conditions. After conducting a visit, GAL Wagenblast determined that Father's camper was habitable, and he notified the parties' attorneys of his findings and he further stated that Father's parenting time should resume.

[12]     On August 21, 2017, Father filed a Verified Motion for Rule to Show Cause, alleging that Mother had denied him parenting time in the summer of 2017. On September 19, 2017, GAL Wagenblast filed a detailed report comprised of multiple recommendations and observations. GAL Wagenblast stated that Mother should have sole legal and physical custody of the Child, Father should have parenting time according to the Indiana Parenting Time Guidelines with parenting time exchanges to occur at Family House, and Father to regularly pay his child support. On September 29, 2017, the trial court conducted a hearing regarding parenting time issues. Following that hearing, the trial court issued an order adopting GAL Wagenblast's recommendations regarding parenting time.

[13]     A final dissolution hearing was held on March 7, 2018, March 22, 2018, and April 6, 2018, where all pending matters were addressed. The parties

subsequently submitted their proposed findings of facts and conclusions thereon. On April 23, 2018, the trial court entered its findings of fact and conclusions of law dissolving the parties' marriage.

Father now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

Here, the trial court made findings of fact and conclusions of law thereon pursuant to Indiana Trial Rule 52(A) in its dissolution decree and its amendment thereof. Our standard of review is therefore two-tiered. "We first determine whether the evidence supports the findings and then whether those findings support the judgment." *Bertholet v. Bertholet*, 725 N.E.2d 487, 495 (Ind. Ct. App. 2000). On review, we do not set aside the trial court's findings or judgment unless clearly erroneous. T.R. 52(A). A finding is clearly erroneous when there is no evidence or inferences reasonably drawn therefrom to support it. *Bertholet*, 725 N.E.2d at 495. The judgment is clearly erroneous when it is unsupported by the findings of fact and conclusions entered on the findings. *Id*. We may affirm the judgment on any legal theory supported by the findings if that theory is consistent with "all of the trial court's findings of fact and the inferences reasonably drawn from the findings[,]" and if we deem such a decision prudent in light of the evidence presented at trial and the arguments briefed on appeal. *Id*. In addition to the standard of review set forth in Indiana Trial Rule 52, there is a longstanding preference in family law matters that the

trial court's determinations are entitled considerable deference. *Swadner v. Swadner*, 897 N.E.2d 966, 971 (Ind. Ct. App. 2008). By virtue of their "unique, direct interactions with the parties fact-to-face, over an extended period of time[,]" trial courts are in a better position than appellate courts "to assess credibility and character through both factual testimony and intuitive discernment." *Best v. Best*, 941 N.E.2d 499, 502 (Ind. 2011).

## II. *Father's Imputed Income*

[16] The Indiana Child Support Guidelines (the Guidelines) provide,

> If a court finds a parent is voluntarily unemployed or underemployed without just cause, child support shall be calculated based on a determination of potential income. A determination of potential income shall be made by determining employment potential and probable earnings level based on the obligor's work history, occupational qualifications, prevailing job opportunities, and earnings levels in the community.

Ind. Child Support Guideline 3(A)(3). "Potential income may be determined if a parent has no income, or only means-tested income, and is capable of earning income or capable of earning more." *Id*. cmt 2c. "But the Guidelines do not require or encourage parents to make career decisions based strictly upon the size of potential paychecks, nor do the Guidelines require that parents work to their full economic potential." *Sandlin v. Sandlin*, 972 N.E.2d 371, 375 (Ind. Ct. App. 2012). "Obviously, a great deal of discretion will have to be used in this determination." Ind. Child Support Guideline 3(A)(3), cmt 2c. Indeed, we will reverse a trial court's decision regarding a parent's unemployment or

underemployment and imputation of potential income only for an abuse of discretion. *In re Paternity of Pickett*, 44 N.E.3d 756, 762 (Ind. Ct. App. 2015). In determining whether the trial court abused its discretion, we do not reweigh the evidence or judge the credibility of witnesses, and we consider only the evidence and reasonable inferences favorable to the judgment. *Id.*

[17] In the Decree, the trial court entered the following pertinent findings regarding Father's work history and income:

> 42. Father worked at Budd Mechanical Services from January 1, 2017 through April 20, 2017 (when Father was fired from his job prompting him to file the petition to modify child support) and during these 37 weeks,[1] Father earned $10,818.75 or $676.19 per week. Father asks this [c]ourt to show him having a gross weekly income of $208.00 by distributing his $10,818.75 over the course of the entire year. The [c]ourt is not inclined to do so.

> 43. Father filed for unemployment, but he was denied because Budd Mechanical Services disputed it. Father failed to appeal the denial because he claimed he was too stressed out from the divorce proceedings.

> 44. Father blamed Mother for his loss of employment and accused her of sending letters to his employer containing Father's criminal history and a copy of the Order for Protection Mother obtained against Father. However, these two letters were received by Budd Mechanical Services in December of 2016 and late January or early February of 2017. Father was fired in late

---

[1] We note a scrivener's error. Father was employed by Budd from January 1, 2017, through April 20, 2017. This was about sixteen weeks and not thirty-seven weeks.

April of 2017 for failing to answer his telephone when his employer tried to call him. Father claimed that he was not "on call" when his employer tried to reach him, yet still they fired him.

45. Mother testified that since she has known Father, he has always earned substantially more than $10,000.00 per year. It is Mother's belief that Father was intentionally underemployed. The [c]ourt agrees.

46. Father is a qualified HVAC systems mechanic who is trained to repair, modify and install HVAC systems. Father also possesses OSHA certifications which would only enhance Father's employability. Father is a handy tradesman who has performed odd jobs for his attorney, landlord, and others during the pendency of this dissolution.

47. Although Father made some efforts to get a job, the [c]ourt finds these efforts fell far short of what he could have done to secure any kind of paying job from May of 2017 through April of 2018. Father testified that he was afraid potential employers would not want to deal with his record or with Mother mailing incriminating documents or calling his employer to report him for various behaviors. Father also testified that he was "depressed" and "did very little" to find employment despite having no issues finding employment before April of 2017.

48. On December 17, 2017, Father filed [sic] to register his new HVAC business, Arctic Fire Heating & Air, LLC, with the Indiana Secretary of State. However, Father could not indicate how many hours a week he put toward his business nor could he describe what kind of plan he had in place to grow his business.

49. The [c]ourt finds that Father's lack of efforts to obtain employment, in the context of this particular case with this particular Father, constitute voluntary underemployment.

(Appellant's App. Vol. II, pp. 28-29).

[18] Father contends that the trial court erred when it determined that he was voluntarily underemployed and imputed income to him based on his earnings from previous years.

[19] In support of his claim that he was not voluntarily unemployed, Father blames Mother for his unemployment in 2016 and 2017. Specifically, Father states that it was Mother who sent the anonymous letters to Parkway and Budd which resulted in him being terminated from his employment. First, we note that while the letters sent to Budd and Parkway containing Father's criminal history were printouts, the address on the envelope was handwritten. According to Father, the handwriting on both envelopes was Mother's. Other than his testimony, Father did not offer any corroborating evidence to support his claim, and Mother denied sending those letters at the final hearing. Further, we note that when Parkway terminated Father in September 2016, other than being notified of Father's past criminal history, Parkway ended Father's employment due to the fact that Mother had notified Parkway by phone call, that Father had stalked her using Parkway's truck. In addition, we find that while Budd received the same anonymous letter containing Father's criminal history in January or February 2017, Budd terminated Father after he failed to answer its call in April 2017.

[20] Father additionally claims that he was not voluntarily underemployed since he "actively sought employment even to the point of starting his own company," after being terminated by Budd in April 2017. (Appellant's Br. p. 20). The record shows that Father applied for unemployment benefits but was denied because Budd disputed the claim. When asked why he did not appeal the denial, Father's excuse was that he "was just stressed out" from the divorce proceeding to pursue an appeal. (Tr. Vol. II, p. 189). Father admitted that he stopped his job search because he was fearful that another anonymous letter regarding his criminal background would be sent to his potential future employer once he secured employment. At the final hearing, he admitted that he was "depressed" and "did very little" to find employment despite having no issues finding employment before April 2017. (Tr. Vol. IV, p. 4).

[21] Moreover, the trial court heard evidence indicating that Father was qualified to repair, modify, and install HVAC systems. Also, evidence was presented that Father possessed "OSHA certifications which would only enhance Father's employability." (Appellant's App. Vol. II, p. 28). Notably, although Father had been unable to find employment between April 2017 and December 2017, Father traded his services and performed "odd jobs for his attorney, landlord, and others during the pendency of this dissolution." (Appellant's App. Vol. II, p. 28). Father has not established that the trial court abused its discretion in finding him to be voluntarily underemployed.

[22] In addition to finding that Father was voluntarily unemployed, the trial court imputed a weekly gross income of $791 per week. Because Father was self-

employed at the time of the dissolution hearing, the trial court arrived at Father's imputed weekly gross income by averaging Father's annual gross income from 2015 through 2017 based on his tax return filings. Father contends that the trial court's use of income averaging to calculate his child support obligation was clearly erroneous. We disagree.

[23] In *Trabucco v. Trabucco*, 944 N.E.2d 544, 547 (Ind. Ct. App. 2011), *trans. denied*, the husband, a urologist, was arrested for maintaining a marijuana growing operation and convicted of marijuana possession. Husband's income fluctuated after the conviction because his medical license was briefly suspended, he had difficulty obtaining medical malpractice insurance, he lost patients, and he experienced other problems. *Id*. at 547-48. The trial court calculated husband's gross weekly income by taking the income reported on husband's tax returns over a five-year period, disregarding the highest and lowest annual incomes, and averaging the incomes for the remaining three years. *Id*. at 548. We affirmed the trial court's income calculation. *Id*. at 553. Courts often use income averaging to determine the gross weekly income of self-employed child support obligors. *Id*. at 552. We noted that "all forms of self-employment create some level of unpredictability in income, and such factual determinations are best left to the trial court." *Id*. Contrary to Father's contention, the *Trabucco* holding allows courts to use the income averaging method to determine the gross weekly income of self-employed child support obligors.

[24] In the Decree, the trial court entered the following pertinent findings:

40. Neither party presented evidence as to what Father earned for the entire year in 2015. However, Father worked at least part of the year at Hamstra Builders, Inc. as evidenced by a September 18, 2015 paystub which showed Father's gross year-to-date income was $32,763.39 or $885.50 per week ($32,763.39÷37 weeks).

41. The [c]ourt finds that Father's gross income in 2016 was $42,234.00 or $812.19 per week.

42. Father worked at Budd Mechanical Services from January 1, 2017 through April 20, 2017 (when Father was fired from his job prompting him to file the petition to modify child support) and during these 37 weeks,[2] Father earned $10,818.75 or $676.19 per week. Father asks this [c]ourt to show him having a gross weekly income of $208.00 by distributing his $10,818.75 over the course of the entire year. The [c]ourt is not inclined to do so.

* * * *

50. The [c]ourt therefore finds it appropriate to average Father's weekly gross income for the past three years in determining and imputing an equitable income to put in Father's column for calculating child support.

51. Using . . . Father's weekly gross income for 2015 ($886), 2016 ($812) and 2017 ($676) comes to $791.00 per week.

(Appellant's App. Vol. II, pp. 28-29).

---

[2] As noted, this is a scrivener's error and it should be sixteen weeks instead of thirty-seven weeks.

Upon finding that Father was voluntarily unemployed, and in applying the income-averaging methodology in calculating Father's potential weekly gross income, the trial court used Father's income tax returns from 2015 through 2017, which showed a weekly gross income of $886, $812, and $676 respectively. The average gross income earned during those three years amounted to $791.00. per week. Here, the trial court considered all the relevant evidence relating to Father's income for child support purposes, thus, we affirm the trial court's calculation.

### III. *Contempt*

Father argues that the trial court erred when it failed to hold Mother in contempt for denying him parenting time in the summer of 2017. Contempt of court "involves disobedience of a court which undermines the court's authority, justice and dignity." *Henderson v. Henderson*, 919 N.E.2d 1207, 1210 (Ind. Ct. App. 2010) (citing *Srivastava v. Indianapolis Hebrew Congregation*, *Inc.* 779 N.E.2d 52, 60 (Ind. Ct. App. 2002), *trans. denied*). There are two types of contempt: direct and indirect. *Id.* Direct contempt involves actions occurring near the court that interfere with the business of the court and of which the judge has personal knowledge. *Id.* Contempt is indirect if it involves actions outside the trial court's personal knowledge. *Id.* "Willful disobedience of any lawfully entered court order of which the offender had notice is indirect contempt." *Id.* (citing *Francies v. Francies*, 759 N.E.2d 1106, 1118 (Ind. Ct. App. 2001), *reh'g denied, trans. denied*). The determination of whether a party is in contempt of court is a matter within the trial court's discretion, and the trial court's decision

will only be reversed for an abuse of discretion. *Piercey v. Piercey*, 727 N.E.2d 26, 31 (Ind. Ct. App. 2000).

[27] The Provisional Order entered on March 28, 2016, granted Mother temporary sole legal and physical custody of the Child, and Father was to exercise parenting time every other weekend from Friday 4:30 p.m. to Sunday 6:00 p.m. In May 2017, Father was evicted from his apartment, and Father refused to divulge his address to Mother. Father's actions prompted Mother to file a Verified Motion to Modify Parenting Time, where she sought Father's parenting time to be supervised at Family House since Father had failed to disclose his address. Sometime in June 2017, DCS initiated an investigation against Father based on a claim that his camper was infested with bed bugs. In the wake of that investigation, and concerned for the Child's safety and wellbeing, Mother enlisted the help of GAL Wagenblast, who, in turn, inspected Father's new residence and confirmed that it was habitable. During this time, Mother denied Father parenting time on several occasions. On August 21, 2017, Father filed a Verified Motion for Rule to Show Cause, alleging that Mother had denied him parenting time in the summer of 2017.

[28] Other than her concern about the Child's safety, Mother's other defense to Father's contempt action was that she partly relied on GAL Wagenblast's advice to deny Father parenting time in the summer of 2017. During the dissolution hearing, when questioned about Mother's claim, GAL Wagenblast testified as follows

I don't remember exactly what I said. It is possible that at one point I told her . . . that if she chose not to allow parenting time while the [DCS] investigation was going on, I would understand that.

(Tr. Vol. II, p. 31). In the Decree, the trial court found that:

135. During the summer of 2017, Father had been evicted from his apartment but did not notify Mother that he was no longer going to live there, he was investigated by the Indiana Department of Child Services for having bedbugs in his home (which was later unsubstantiated), he purchased and moved into a camper on a friend's property but at least initially he did not inform Mother of his address or location, and Father was involved in litigation in another court in which Father's parenting time was restricted with his two prior born children.

136. Mother's concern related to the goings-on in that unrelated case caused her to withhold parenting time from Father until things were sorted out further.

137. The [c]ourt agrees that Mother withheld parenting time from Father for a portion of the summer of 2017. However, the [c]ourt finds that she did not do so to punish Father. Rather, between May and August of 2017, there were numerous things going on in Father's life that were suspect and needed fleshing out before Mother would allow [the Child] to have parenting time with Father as previously ordered. Therefore, the [c]ourt does not find Mother in contempt.

(Appellant's App. Vol. II, p. 45). Father does not directly challenge these findings, and we hold that they are supported by the evidence and not clearly erroneous. While we do not condone Mother's actions of denying Father

parenting time in the summer of 2017, we cannot say that Mother's actions amounted to willful disobedience considering her valid concerns between May and August of 2017 when numerous things were going on in Father's life. Here, we find that Mother met her burden of showing that her conduct did not amount to willful disobedience of the parenting time order; therefore, we affirm the trial court's decision.

## IV. *Division of the Marital Estate*

[29] Father contends that the division of the marital estate was clearly erroneous for three reasons: (1) the trial court ignored the parties agreement regarding the division of the marital estate; (2) the trial court erroneously assigned to him the debt on the Verizon bill rather than dividing it equally between the parties; and (3) the trial court erred when it included a construction bill which had been incurred by Mother after the dissolution petition had been filed. We shall address each issue in turn.

### A. *Parties' Agreement*

[30] The division of marital assets lies within the sound discretion of the trial court, and we will reverse only for an abuse of that discretion. *J.M. v. N.M.*, 844 N.E.2d 590, 602 (Ind. Ct. App. 2006), *trans. denied*. An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances presented. *Id*. When we review a challenge to the trial court's division of marital property, we may not reweigh the evidence or

assess the credibility of witnesses, and we will consider only the evidence most favorable to the trial court's disposition of marital property. *Id.*

[31] Pursuant to Indiana Code section 31-15-7-5, a trial court shall presume that an equal division of the marital property between the parties is just and reasonable. The court may deviate from the statutory presumption of equal distribution if a party presents relevant evidence to show that an equal division would not be just and reasonable. Such evidence may include evidence of: (1) each spouse's contribution to the acquisition of property; (2) acquisition of property through gift or inheritance prior to the marriage; (3) the economic circumstances of each spouse at the time of disposition; (4) each spouse's dissipation or disposition of property during the marriage; and (5) each spouse's earning ability. I.C. § 31-15-7-5; *Chase v. Chase*, 690 N.E.2d 753, 756 (Ind. Ct. App. 1998).

[32] In 2010, prior to her marriage to Father, Mother purchased the marital residence (House) which was covered by a Chase mortgage (First Mortgage). There was also another mortgage by 1st Merchant's Bank (Second Mortgage) which was taken out during the parties' marriage. Prior to the dissolution hearing, Mother's counsel prepared a spreadsheet listing all the parties' assets and debts. While every asset and liability were assigned to either Father or Mother, the House, the First and Second Mortgage were not assigned to either party. Without factoring these three items, and pursuant to the parties' spreadsheet, the total marital assets and liabilities subject to equitable division was $93,391.62 and $122,447.28, respectively. Father was required to pay Mother and equalization payment of $7,288.71. At the dissolution hearing, the

parties stipulated to that spreadsheet, agreeing to the division of the marital estate in accordance with that spreadsheet.

[33] Father's sole contention on appeal is that the spreadsheet *ostensibly divided all* the parties' assets and debts, and that the trial court abused its discretion in dividing the marital estate in light of the parties' agreement. In support, Father cites *Nornes v. Nornes*, 884 N.E.2d 886 (Ind. Ct. App. 2008) where this court held that

> *in the absence of an agreement of the parties to the contrary*, where the parties divide between themselves a part of the marital estate and leave the division of the balance to the discretion of the trial court, the trial court should assume that the property that the parties have already divided was divided justly and reasonably and shall divide the remainder of the assets and liabilities of the parties as if they were the entirety of the marital estate.

*Id*. at 889 (emphasis in original). Father continues to argue

> like the court espoused in [*Nornes*], the trial court should have refrained from interfering with the parties' right to enter into agreements nor should it have second guessed the wisdom of the parties in entering into agreements on how to divide marital property. Accordingly, the trial court was required to assume that [Father] and [Mother] had already equitably divided the marital estate, including the marital residence, the first mortgage, and any money needed to equalize the estates.

(Appellant's Br. p. 29). Mother counters Father's argument by claiming that while she stipulated to the spreadsheet, that spreadsheet was "never intended to be a full agreement as to the division of all assets and debts in the marital estate." (Appellee's Br. p. 30). We agree.

[34]     A close examination of the spreadsheet shows that several items were excluded from the parties' spreadsheet. In particular, the House, First and Second Mortgage were listed on the spreadsheet; however, those items were not assigned to either party. This evidence counters Father's claim that the spreadsheet proposed a complete division of the parties' marital estate. In dividing the parties' marital estate, the only task that the trial court had at the parties' dissolution hearing was to divide the items not stipulated in the spreadsheet.

[35]     Like the *Nornes'* holding, the trial court was within its discretion to divide other marital property not stipulated or allocated in the spreadsheet. *See Nornes*, 884 N.E.2d at 889 (holding that the trial court has discretion to divide the balance of the marital estate not falling within the parties' agreement). In sum, because the spreadsheet did not fully divide of *all* the parties' marital property, and consistent with the *Nornes'* holding, the trial court properly exercised its discretion in allocating, and dividing the items left out from parties' spreadsheet. Therefore, we find no abuse of discretion.

## B. *Verizon Bill*

[36]     At the final hearing, the trial court was presented with a Verizon bill, in Father's name, amounting to $1,222.38. Father requested the trial court to include that amount in the marital pot. Notwithstanding his request, the trial court did not include the bill in the marital estate and wholly allocated that expense to Father. Father claims that the trial court erred.

[37] Marital property includes both assets and liabilities. *McCord v. McCord*, 852 N.E.2d 35, 45 (Ind. Ct. App. 2006), *trans denied*. Again, in Indiana, all marital property goes into the marital pot for division, even if it was purchased with funds that one spouse brought into the marriage. *See* I.C. § 31-15-7-4(a). In determining how to divide a marital estate, the trial court "shall presume that an *equal* division of the marital property between the parties is just and reasonable." I.C. § 31-15-7-5 (emphasis added). However, this is a rebuttable presumption, and a party may present relevant evidence to establish that an equal division would not be just and reasonable. I.C. § 31-15-7-5. If the trial court determines that a party opposing an equal division has met his or her burden under the statute, the court must state in its findings and judgment its reasons for deviating from the presumption of an equal division. *Hartley v. Hartley*, 862 N.E.2d 274, 285 (Ind. Ct. App. 2007). The trial court must consider all the statutory factors, rather than focusing on just one factor, but need not explicitly address all the factors in every case. *Eye v. Eye*, 849 N.E.2d 698, 701-02 (Ind. Ct. App. 2006).

[38] In the present case, there is no dispute that the Verizon bill is marital property since it was an expense incurred during the parties' marriage and was subject to the presumption of an equal division. However, the trial court found that Mother had rebutted the presumption, and it allocated that liability to Father in its entirety. In support of its decision to deviate from the presumption of an equal division, the trial court made the following findings:

77. Father contends that a Verizon bill in the amount of $1,222.38 was due at the time Mother filed the petition for dissolution, therefore, Mother should be responsible for one-half of that debt.

78. The [c]ourt includes the Verizon bill of $1,222.38 in the marital estate.

79. Mother testified that she and Father each had their own cell phones and separate cell phone accounts throughout the marriage and each paid for his or her own bills related to those accounts. Mother also testified that this particular Verizon account which Father wants included in the division of the marital estate provided Father and Father's two prior born children with cell phones—not her.

80. The [c]ourt finds this account belonged exclusively to Father and was treated as his own account throughout the marriage. Further it was only after the parties separated that Father felt Mother should be responsible for his delinquent bill. The [c]ourt removes the Verizon bill of $1,222.38 from the division of the marital estate and finds that Father is solely responsible for the payment of that bill and he shall hold Mother harmless therefrom.

(Appellant's App. Vol. II, p. 34).

[39]   Mother testified that each party was responsible for their own cellphone bills during their marriage, and that the parties continued with this same arrangement post-filing. In addition, the record shows that Father's Verizon account also included a third user, Father's mother. Based upon the record and given that the trial court indicated that it intended to divide the marital estate

equally and did find that the presumption of equal division had been rebutted, with respect to the Verizon invoice. In short, the trial court's determination that the Verizon bill should be set aside to Father has evidentiary support, and we hold that the trial court did not abuse its discretion in failing to include that bill in the marital pot

### C. *Total Development Construction Bill*

[40] Father contends that the trial court erred by including a construction bill incurred by Mother after the filing date of the dissolution as a marital debt. Father claims that this construction bill was a post-filing expense.

[41] When a party challenges the trial court's division of marital property, he must overcome a strong presumption that the court considered and complied with the statute. *Galloway v. Galloway*, 855 N.E.2d 302, 304 (Ind. Ct. App. 2006). We may not reweigh the evidence or assess the credibility of witnesses, and we will consider only the evidence most favorable to the trial court's judgment. *Id*. Although the facts and reasonable inferences might allow for a different conclusion, we will not substitute our judgment for that of the trial court. *Id*. In general, any debt incurred by one party after the filing date of the dissolution petition is not to be included in the marital pot. *Sanjari v. Sanjari*, 755 N.E.2d 1186, 1192 (Ind. Ct. App. 2001).

[42] On the construction expenses at issue, the trial court entered the following findings:

102. At some point during the marriage, Mother obtained a second mortgage on the marital residence to be used to improve and repair the property. Before the parties separated, Father began doing some work inside and outside of the residence. Before he completed the work, the parties separated and Father left an unfinished garage, basement, siding and driveway.

103. The condition of the marital residence was such that the City of Valparaiso Inspector threatened to issue citations to Mother for the work that was left unfinished.

104. In order to avoid being cited by the City, Mother hired Total Development Construction, Inc. to complete enough work on the residence to bring it into compliance with the City. These repairs cost Mother $3,400.00.

105. The [c]ourt finds the debt of $3,400 should be included in the division of the marital estate despite being incurred after the parties separated because these expenses were specifically incurred due to work that was in progress before the dissolution proceedings began and necessary to prevent the marital residence and the home of the parties' minor child from being the subject of fines and/or litigation with the City of Valparaiso.

(Appellant's App. Vol. II, pp. 37-38).

[43] Father claims that Mother did not present any evidence that the "structure violated any city codes when construction began." (Appellant's Br. p. 31). Father also argues that Mother did not object to any of the home repairs during the marriage. Father's arguments on appeal essentially ask us to reweigh his evidence and judge his credibility, which we will not do. While the repair expenses were post-filing expenses, Mother testified that all the repairs related

to unfinished projects commenced by Father during their marriage. Indeed, we presume the trial court followed the law and made all the proper considerations in making its decision. *See Maxwell v. Maxwell*, 850 N.E.2d 969, 973 (Ind. Ct. App. 2006), *trans. denied*. Therefore, we are satisfied that the trial court properly included the construction repair costs in the marital estate.

# CONCLUSION

[44] Based on the foregoing, we conclude that the trial court properly found that Father was voluntarily underemployed, and we affirm the trial court's calculation of Father's imputed weekly gross income. Also, we conclude that the trial court did not abuse its discretion by finding Mother was not in contempt of the parenting time order. Lastly, we hold that the trial court did not abuse its discretion in dividing the marital estate.

[45] Affirmed.

[46] Vaidik, C. J. and Bradford, J. concur